**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Alfred Copeland,<br>Petitioner<br>-vs-<br>Charles L. Ryan, et al.,<br>Respondents. | CV-13-2278-PHX-PGR (JFM)<br><br>**Report & Recommendation**<br>**on Petition for Writ of Habeas Corpus** |

## I. MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Arizona State Prison Complex at Florence, Arizona, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 7, 2013 (Doc. 1).   On June 27, 2013 Respondents filed their Response (Doc. 15).   Petitioner filed a Reply on September 3, 2014 (Doc. 20).

The Petitioner's Petition is now ripe for consideration.   Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

## A. FACTUAL BACKGROUND  AND PROCEEDINGS AT TRIAL

On February 11, 2002, Petitioner was indicted (Exhibit X) in Maricopa County Superior Court.   On direct appeal, the Arizona Court of Appeals described the charges as follows:

> The State indicted Copeland on three counts of sexual abuse, one count of child molestation, one count of sexual conduct with a minor, two counts of sexual exploitation of a minor, one count of

1

> incest, and three counts of furnishing obscene or harmful items to minors. Four of the eleven counts involved dangerous crimes against children. The indictment stemmed from Copeland's alleged misconduct involving six separate victims.

(Exhibit J, Mem. Dec. at 2.) (Exhibits to the Answer, Doc. #, are referenced herein as "Exhibit ___.")   Petitioner proceeded to trial and the jury convicted on ten of the eleven counts filed against him. The trial court sentenced Petitioner to a total of 118 years incarceration. (*Id.* at 3.)   Petitioner was acquitted on Count 9, one of the charges of furnishing obscene materials. (Exhibit G, R.T. 9/25/02 at 4.)

## B.  PROCEEDINGS ON DIRECT APPEAL

Petitioner filed a direct appeal, arguing that insufficient evidence supported his convictions on Count 3, sexual conduct with a minor, and Count 11, furnishing obscene or harmful items to a minor. (Exhibit I, Opening Brief.)  The Arizona Court of Appeals rejected Petitioner's arguments, and affirmed his convictions and sentences. (Exhibit J, Mem. Dec. at 9.)

Petitioner filed a Petition for Review (Exhibit K) seeking review by the Arizona Supreme Court.  That court summarily denied review on June 2, 2004. (Exhibit J, Order and Mandate; Exhibit T, PCR Not. at Exhibit, Order 6/2/4.)

Petitioner did not file a petition for certiorari with the United States Supreme Court. (Petition, Doc. 1 at 3.)

## D.  PROCEEDINGS ON POST-CONVICTION RELIEF

**First PCR Proceeding** – Petitioner commenced his first post conviction relief (PCR) proceeding by filing on April 23, 2008 a Notice of Post-Conviction Relief (Exhibit L).  That proceeding was dismissed on May 5, 2008 through a minute entry filed on May 9, 2008 (Exhibit M) on the basis that it was untimely.

Petitioner sought review by the Arizona Court of Appeals (Exhibit N), which was summarily denied on September 1, 2009 (Exhibit O).

**Second PCR Proceeding** – Petitioner commenced his second PCR proceeding by

2

filing on January 5, 2010 a second Notice of Post-Conviction Relief (Exhibit P).  He filed his Petition for Post-Conviction Relief (Exhibit Q) on the same date.  The PCR court appointed counsel to represent Petitioner.  (Exhibit R, M.E. 3/16/10.)  On July 16, 2010, appointed counsel filed a Notice of Completion of Post-Conviction Review (Exhibit S) evidencing an inability to find a colorable issue for review.

On August 18, 2010, Petitioner filed a second Notice of Post-Conviction Relief (his third such notice) and a *pro per* Petition for Post-Conviction Relief. (Exhibit T.)  On February 10, 2011, the PCR court dismissed the petition as untimely and successive. (Exhibit U, M.E. 2/10/11.)

On April 11, 2011, Petitioner filed a petition for Review with the Arizona Court of Appeals (Exhibit V).  That court summarily denied review on January 4, 2013 (Exhibit W).


**E.  PRESENT FEDERAL HABEAS PROCEEDINGS**

**Petition** – Over 10 months later, Petitioner commenced the current case by filing his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 7, 2013 (Doc. 1).  The Petition is dated that same date.  On November 12, 2013, Petitioner filed 3 additional pages of attachments (Doc. 5).

Petitioner's Petition asserts the following grounds for relief:

> (1)   Petitioner was denied effective assistance of counsel, in violation of the Sixth Amendment;
> (2)   Petitioner's trial counsel was ineffective for failing to procure the victim's statements before trial, in violation of the Sixth Amendment;
> (3)   Petitioner's trial counsel was ineffective for failing to present evidence showing Petitioner was not in Arizona during the time of the incidents alleged in the indictment;
> (4)   Petitioner's convictions for Counts Five and Eleven of the indictment were invalid because they were barred by the statute of limitations;
> (5)   Petitioner's trial counsel was ineffective for failing to elicit testimony on cross-examination that witness Tracy Beauchamp was present at the time of the alleged misconduct in Count One and Two of the indictment and that she originally told police "nothing criminal happened";

(6)    Petitioner's trial counsel was ineffective for failing to object when the trial court failed to give a clarifying jury instruction that the jury should ignore the state's references to "DNA evidence" because no such evidence existed; and

(7)    The trial court lacked subject matter jurisdiction to try Petitioner because the indictment was invalid on its face, in violation of Petitioner's due process rights.

(Order 3/31/14, Doc. 8 at 1-2.)

**Response** - On June 27, 2013, Respondents filed their Response ("Limted Answer") (Doc. 15). Respondents argue that the petition is barred by the statute of limitations, portions of the claims are not federal claims and thus not cognizable on habeas review, and that Petitioner has procedurally defaulted on his state remedies.

**Reply** - On September 3, 2014, Petitioner filed a Reply (Doc. 20). Liberally construing the Reply, Petitioner argues that the statute of limitations cannot bar his jurisdictional claims and the ineffectiveness of his counsel justifies equitable tolling. Petitioner also argues that various claims were fairly presented to the state courts, and any deficiencies are subject to cause due to the lack of a state hearing, the jurisdictional nature of his claims, and the ineffectiveness of counsel, or should be excused to avoid a miscarriage of justice because of his actual innocence or the jurisdictional nature of his claims.

### III. APPLICATION OF LAW TO FACTS

**A.  TIMELINESS**

**1.   One Year Limitations Period**

Respondents assert that Petitioner's Petition is untimely. As part of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress provided a 1-year statute of limitations for all applications for writs of habeas corpus filed pursuant to 28 U.S.C. § 2254, challenging convictions and sentences rendered by state courts. 28 U.S.C. § 2244(d). Petitions filed beyond the one year limitations period are barred and must be dismissed. *Id.*

**2.  Commencement of Limitations Period**

The one-year statute of limitations on habeas petitions generally begins to run on "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).[1]

Here, Petitioner's direct appeal remained pending through June 2, 2004, when the Arizona Supreme Court denied his Petition for Review.  (Exhibit J, Order and Mandate.)

It is well established in the Ninth Circuit that for purposes of 28 U.S.C. § 2244, "direct review" includes the period within which a petitioner can file a petition for a writ of certiorari from the United States Supreme Court, whether or not the petitioner actually files such a petition. *See Bowen v. Roe*, 188 F.3d 1157, 1158 (9th Cir.1999).  The rules of the Supreme Court of the United States, requires that a petition for a writ of certiorari be filed "within 90 days after entry of the order denying discretionary review." U.S.S.Ct. R. 13(1). Accordingly, because Petitioner did not file a petition for a writ of certiorari, his conviction became final on Tuesday, August 31, 2004, 90 days after the Arizona Supreme Court denied review.

Therefore, Petitioner's one year began running on September 1, 2004, and without any tolling expired on August 31, 2005, making his Petition, filed November 7, 2013 (Doc. 1), over eight years delinquent.

**3.  Statutory Tolling**

The AEDPA provides for tolling of the limitations period when a "properly filed application for State post-conviction or other collateral relief with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2).  This provision only applies to state proceedings, not to federal proceedings.  *Duncan v. Walker*, 533 U.S. 167 (2001).

Petitioner's limitations period commenced running on September 1, 2004 and

---

[1]  Later commencement times can result from a state created impediment, newly recognized constitutional rights, and newly discovered factual predicates (as opposed to evidence to support such facts) for claims.  *See* 28 U.S.C. § 2244(d)(1)(B)-(D). Petitioner proffers no argument that any of these apply.  None appear to apply.

expired on August 31, 2005.   Petitioner's First PCR proceeding was commenced on April 23, 2008, almost 32 months after it expired.   Once the statute has run, a subsequent post-conviction or collateral relief filing does not reset the running of the one year statute.   *Jiminez v. Rice*, 276 F.3d 478, 482 (9th Cir. 2001); *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003).

Similarly, his second PCR proceeding was not commenced until January 5, 2010, long after his limitations period had expired.   Thus it had no effect on the limitations bar.

Accordingly, Petitioner has no statutory tolling resulting from his first or second PCR proceedings, and his limitations period expired on August 31, 2005.

Consequently, Petitioner's habeas petition was over eight years delinquent.


**4.  Effect of Jurisdictional Nature of Claims**

Petitioner argues that the habeas statute of limitations cannot bar his petition because he has asserted claims which reflect a lack of jurisdiction by the convicting court.  (Reply, Doc. 20 at 2.)

It is true that a claim of a lack of subject matter jurisdiction can generally be asserted at any time during the pendency of a matter.   *See e.g.* Wright & Miller, *Fed. Pract. & Proc.* § 1393.   Here, however, Petitioner's criminal case is no longer pending, and this collateral habeas proceeding is not part of that prosecution.   Petitioner cites no authority extending the proposition to collateral proceedings, nor to using it to avoid a limitations bar to those collateral proceedings.   The undersigned knows of none.  *See Tucker v. Ryan*, No. CV-13-00577-PHX-JAT, 2014 WL 1329293, at *5 (D. Ariz. Apr. 1, 2014) (finding no basis for an exception to the habeas limitations bar for claims based on lack of subject matter jurisdiction).[2]  *Cf. U.S. v. Castro-Verdugo*, 750 F.3d 1065, 1068

---

[2] In *Tucker*, Judge Teilborg further found the challenges to state court jurisdiction to be a matter of state law, unreviewable in federal habeas court.   Here, however, portions of Petitioner's jurisdictional challenges underlying Ground One are based upon assertions that he was outside the State of Arizona at the time of the offense, raising at least tangentially a uniquely federal issue of the exercise of extra-territorial jurisdiction.   Of course, to the extent that Petitioner's subject matter claims are simply part of the factual

(9th Cir. 2014 (subject matter jurisdiction attack on underlying conviction not properly brought in appeal of probation violation order).

Petitioner cites as authority for his argument the case *United States v. Vreeken*, 803 F.2d 1085 (10th Cir. 1986).  (Reply, Doc. 20 at 2, n. 1.)  However that case involved neither a habeas petition (it was a direct appeal), nor even a subject matter jurisdiction claim.  To the contrary, the *Vreeken* court cited in *dicta* the principle that the parties cannot consent to subject matter jurisdiction, only to determine that an objection to venue under an extradition treaty was an issue of personal jurisdiction which could be waived.

Petitioner's citation indicated a quotation from *Vreekin*: "Defendant may raise objections at any time to subject-matter jurisdiction…".  (Reply, Doc. 20 at 2, n. 1. However that quotation does not appear in that case.  Nonetheless, the principle is not unknown.  *See e.g. Henderson ex rel. Henderson v. Shinseki,* 562 U.S. 428 (2011) ("Objections to subject-matter jurisdiction, however, may be raised at any time."); and *U.S. v. Cotton*, 535 U.S. 625 (2002).   The undersigned has found no instance, however, where it has been used to defeat a statute of limitations bar on collateral review, rather than in a continuation of the proceeding the jurisdiction over which is being attacked.  In *Henderson*, the issue of subject matter jurisdiction was raised on certiorari from a decision of the Board of Veterans' Appeals. In *Cotton*, the issue was raised on direct appeal from the U.S. District Court.

Moreover, those cases speak in terms of there being no waiver of an objection to subject matter jurisdiction earlier in the same case.  Here, the question is not whether Petitioner has waived his jurisdictional claims, but whether he can now assert them in this collateral, habeas proceeding in light of his failure to comply with the applicable statute of limitations.   Petitioner points to no cases holding that subject matter jurisdiction claims are not subject to any limitation.  Indeed, such claims are regularly

---

basis of a claim of ineffective assistance under the Sixth Amendment, that claim of ineffective assistance would clearly be a federal question.

1    barred from consideration in subsequent litigation on the basis of the principles of *res*

2    *judicata*, to preserve the finality of judgments.  *See Ruhrgas AG v. Marathon Oil Co.,*

3    526 U.S. 574, 586 (1999) (citing *Restatement (Second) of Judgments* § 12 (1980)).

4        Accordingly, the habeas limitations bar applies equally to such of Petitioner's

5    claims as may be founded upon a lack of subject matter jurisdiction of the convicting

6    court.

7

8    **5.  Equitable Tolling**

9        "Equitable tolling of the one-year limitations period in 28 U.S.C. § 2244 is

10   available in our circuit, but only when 'extraordinary circumstances beyond a prisoner's

11   control make it impossible to file a petition on time' and 'the extraordinary circumstances

12   were the cause of his untimeliness.'"  *Laws v. Lamarque*, 351 F.3d 919, 922 (9th Cir.

13   2003).

14           To receive equitable tolling, [t]he petitioner must establish two
             elements: (1) that he has been pursuing his rights diligently, and (2)
15           that some extraordinary circumstances stood in his way. The
             petitioner must additionally show that the extraordinary
16           circumstances were the cause of his untimeliness, and that the
             extraordinary circumstances ma[de] it impossible to file a petition
17           on time.

18   *Ramirez v. Yates,* 571 F.3d 993, 997 (9th Cir. 2009) (internal citations and quotations

19   omitted).  "Indeed, 'the threshold necessary to trigger equitable tolling [under AEDPA]

20   is very high, lest the exceptions swallow the rule.' " *Miranda v. Castro,* 292 F.3d 1063,

21   1066 (9th Cir. 2002)  (quoting *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir.).

22   Petitioner bears the burden of proof on the existence of cause for equitable tolling.  *Pace*

23   *v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Rasberry v. Garcia*, 448 F.3d 1150, 1153 (9th

24   Cir. 2006) ("Our precedent permits equitable tolling of the one-year statute of limitations

25   on habeas petitions, but the petitioner bears the burden of showing that equitable tolling

26   is appropriate.").

27       Petitioner argues that the statute of limitations cannot bar his claims because

28   counsel was ineffective in failing to raise his claims. (Reply, Doc. 20 at 4.)  Petitioner

fails to explain, however, how the failures of his state court counsel resulted in his failure to meet the habeas filing deadline.  Such failure might explain Petitioner's failure to assert his claims to the state courts, but they do not explain his failure to raise them in a timely habeas petition. *Cf. Holland v. Florida,* 130 S. Ct. 631, 651-652 (2010) (concluding that a *habeas* attorney's repeated failures to respond to a client's inquiries over a period of years, and demands for timely action on his habeas petition, might establish equitable tolling); and *Spitsyn v. Moore,* 345 F.3d 796, 801 (9th Cir. 2003) (allowing equitable tolling where petitioner's *habeas* counsel was hired almost a year in advance, failed to do anything to prepare the habeas petition or to respond to numerous letters and phone calls, and withheld petitioner's file for over two months after the habeas limitations period expired).  Here, Petitioner proffers nothing to suggest that any of his counsel had been retained to represent him in filing his federal habeas petition.

To the extent that Petitioner might rely upon his obligation to exhaust his state remedies on his claims (and the purported failure of state court counsel to do so), the Supreme Court has held that a habeas petitioner may not simply await the completion of belated efforts to exhaust his state remedies, but should file a protective habeas petition, and request to stay its consideration pending exhaustion of state remedies.  *See Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005).

Moreover, even if extraordinary circumstances prevent a petitioner from filing for a time, equitable tolling will not apply if he does not continue to diligently pursue filing afterwards.  "If the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing."  *Valverde v. Stinson*, 224 F.3d 129, 134 (2nd Cir. 2000).  *See Spitsyn*, 345 F.3d at 802 (quoting *Valverde)*. Ordinarily, thirty days after elimination of a roadblock should be sufficient. *See Guillory v. Roe*, 329 F.3d 1015, 1018, n.1 (9th Cir. 2003).  Here, assuming counsel were somehow negligent with respect to Petitioner's federal habeas petition, Petitioner

1    fails to proffer anything to show that he was diligent in the face of such conduct.

2    Petitioner delayed some nine years after the conclusion of his direct appeal, and some

3    eleven months after the conclusion of his PCR proceedings to pursue his federal petition.

4         Accordingly, Petitioner has failed to show a basis for equitable tolling.

5

6    **6.  Actual Innocence**

7         To avoid a miscarriage of justice, the habeas statute of limitations in 28 U.S.C. §

8    2244(d)(1) does not preclude "a court from entertaining an untimely first federal habeas

9    petition raising a convincing claim of actual innocence."  *McQuiggin v. Perkins*, 133

10   S.Ct. 1924, 1935 (2013).   To invoke this exception to the statute of limitations, a

11   petitioner "'must show that it is more likely than not that no reasonable juror would have

12   convicted him in the light of the new evidence.'"  *Id.* at 1935 (quoting *Schlup v. Delo*,

13   513 U.S. 298, 327 (1995)).  This exception, referred to as the "*Schlup* gateway," applies

14   "only when a petition presents 'evidence of innocence so strong that a court cannot have

15   confidence in the outcome of the trial unless the court is also satisfied that the trial was

16   free of nonharmless constitutional error.' " *Id.*  at 1936 (quoting *Schlup,* 513 U.S. at

17   316).

18        While Petitioner makes no such claim of actual innocence to excuse his untimely

19   filing, he does raise assertions of "actual innocence" as a basis to avoid his purported

20   procedural defaults.  In particular, Petitioner argues: (1) he was not in Arizona during the

21   time of the offenses (Reply, Doc. 20 at 6); and (2) the victims originally told police that "

22   'nothing criminal happened' " (*id.* at 8).  Further, Petitioner presents statements from a

23   victim denying the abuse, and from the same victim and another witness asserting

24   Petitioner's absence from the state.  (Petition, Doc. 1-1 at 3-6.)

25        In the context of excusing a procedural default, the petitioner must make a

26   showing of actual innocence on each charge from which he seeks relief.  *Vosgien v.*

27   *Persson*, 742 F.3d 1131, 1136 (9th Cir. 2014) (applying actual innocence exception to

28   procedural default).  As discussed hereinafter, Petitioner's assertions of actual innocence

apply to only a few of the charges of which he was convicted.  Even if the Court could find Petitioner actually innocent on those charges, arguably his claims affecting the other charges would remain barred.

**Absence from the State** - Petitioner proffers in support of his claim that he was not in Arizona, two statements that Petitioner resided in Houston, Texas from March 1979 through September 1984.[3]  (Petition, Doc. 1-1 at 5-6.)  Here, the only charges related to conduct during those times were: Count 5 (between April 2, 1984 and April 2, 1985); Count 7 (between July 9, 1983 and July 9, 1984); and Count 8 (between July 9, 1983 and July 8, 1984).  (Exhibit X, Indictment.)

Count 5 – Photos of TB - Count 5 involved allegations of sexual exploitation of the minor T.B. by taking photos of her engaged in sexual conduct "on or between the 2nd day of April, 1984 and the 2nd day of April, 1985.  T.B. testified that Petitioner took sexually explicit photos of her, and related:

> Q   Where were you living when he did this?
> A   In Phoenix, on Vernon Avenue.
> Q   How old were you?
> A   Either 12 or 13.
> Q   How can you remember your age?
> A   Because I had gone through puberty.  It was at least a year
> and a half before I moved out of his house.

(Exhibit E, R.T. 9/23/02 at 3.)  At the time of trial in September, 2002, T.B. testified alternatively that she was 28 years old (Exhibit D, R.T. 9/19/02 at 146), and that she was born in 1974 (*id.* at 148), making her 38 years old.  Thus, her contradictory testimony about her present age presented evidence that the photographs had either been taken between 1996 and 1997, or between 1986 and 1987.[4] Neither set of dates involved times

---

[3]     These statements are notarized, but are not sworn affidavits or otherwise made under penalty of perjury.  Nonetheless, because it does not affect the outcome, the undersigned presumes that Petitioner could provide such affidavits or declarations under penalty of perjury.

[4]     It is true that T.B.'s testimony placing the photographs in 1986 or 1987 (or 1996 or 1997) was outside the dates specified in the Indictment.  However, a variance in dates between the indictment and the evidence is not fatal to a conviction.  *See e.g. Arnold v. U.S.,* 336 F.2d 347 (9th Cir. 1964).  Even if it were an error, that would not establish Petitioner's actual innocence of the violation he was convicted of committing.  Beyond establishing the age of the victim, the date of the offense was not an element of the

1    when Petitioner was residing in Texas.

2         In addition, T.B. also plainly testified to various uncharged conduct in Houston,

3    Texas.  (*Id.* at 150-152.)  Thus, Petitioner's residence in Texas was before the jury.

4         Further, the victim D.P. testified that the family had moved to the "Vernon house"

5    in September, 1984. (Exhibit D, R.T. 9/19/02 at 98.)  D.P. is the same person providing

6    one of the statements concerning Petitioner's residence in Texas.  (Petition, Doc. 1-1,

7    Attachments at 5.)   Thus, the jury had before it some testimony that indicated the

8    conduct could not have occurred prior to September, 1984.   Thus, any additional

9    testimony that Petitioner resided in Texas prior to September, 1984, would have been

10   cumulative.

11        Moreover, none of that evidence precluded a reasonable juror from concluding

12   that Petitioner had photographed T.B. in Arizona from April 2, 1984 to April 2, 1985 as

13   charge in the indictment.   Thus, the undersigned cannot say that no reasonable juror

14   would have convicted Petitioner on Count 5 in light of evidence of Petitioner's residence

15   in Texas prior to September, 1984.

16        <u>Count 7 & 8 – Sexual Contact with C.U.</u> – Counts 7 and 8 charged Petitioner with

17   engaging in non-consensual sexual conduct with C.U.[5] between July 9, 1983 and July 8,

18   1984 by fondling her breasts (Count 7) and genitals (Count 8). C.U. testified that she was

19   born in July, 1966 (Exhibit D, R.T. 9/19/02 at 66), that after the birth of her son in

20   August, 1983, and before she turned 18, and before her son turned one, Petitioner

21   grabbed her chest and vagina in a house on Buckeye Road (*id*. at 74-75).   Thus,

22   according to C.U.'s testimony at trial this event occurred between August, 1983 and

23   July, 1984.  According to C.U.'s testimony, therefore, this incident would have occurred

24   at a time that Petitioner contends he was living in Texas.

25        However, at the pretrial hearing, C.U. testified that the event occurred "[w]hen we

26

27   offense.  *See*  Ariz. Rev. Stat. § 13-3552, and the victim's testimony about her age at the
     time of the offense was unequivocal.

28   [5] C.U. is identified in the Indictment as K.U., using a different spelling of her first name.
     (Exhibit X, Indictment at 3; Exhibit D, R.T. 9/19/02 at 65.)

moved from Houston to Phoenix, Arizona, in September of '84," and despite the discrepancy given her date of birth, testified that she was "[s]eventeen" at the time. (Exhibit A, R.T. 8/8/02 at 44.)

Nonetheless, a reasonable juror could believe that Petitioner was in Texas until September, 1984, and still believe the testimony of C.U. that the referenced events occurred while the family was residing in the Phoenix area.  A reasonable juror could simply conclude that C.U. was mistaken about her age and the age of her son at the time of the events, but correct about the date and location of the incident.[6]

**Denials Prior Exculpating Statements to Police** – Petitioner contends that several victims had made statements to police denying any improper conduct by Petitioner.

Petitioner presents no evidence of such statements, nor does he explicitly identify the victims to which he refers.  Petitioner does argue that he raised the issue to the state courts.  (*See* Reply, Doc. 20 at 8.)   In his second PCR proceeding, Petitioner presented a notarized statement by the victim D.P. refuting the allegations concerning her, and asserting that she had refused to accuse her father, and "the detective called me a liar." (Exhibit Q, PCR Pet. at "COPE 1", D.P. Statement  8/7/09.)  Petitioner also argues that the victim L.P. "told the detective nothing happened."  (*Id.* at "COPE 9".)

**Denials by D.P.** - As to the victim D.P., Petitioner was charged in Count 6 with incest occurring in 2001.  In his second PCR proceeding, Petitioner presented a notarized statement by the victim D.P. refuting the allegations concerning her, and asserting that she had testified against Petitioner because she had been jailed for three months and had her daughter (the victim L.P.) taken from her by the prosecution.  (Exhibit Q, PCR Pet. at "COPE 1", D.P. Statement  8/7/09.)

---

[6] The charges in Counts 7, 8 were for "sexual abuse," and the Indictment made no allegation that C.U. was a minor at the time of this charged conduct. The version of the statute applicable in 2001 defined sexual abuse as non-consensual sexual contact (e.g. fondling) involving a "person fifteen or more years of age."  Ariz. Rev. Stat. § 13-1404(A) (1994). Thus, whether the jury may have concluded that the incident occurred before or after C.U.'s 18th birthday would not have, of itself, precluded a conviction.

The jury had before it evidence that D.P. had initially refused to incriminate Petitioner:

> Q Debra, right before the break we were talking about August of 2001, when you first started talking with the police. Do you recall that line of questioning?
> A Yes.
> Q I asked you if you were cooperative with the police from the very start and you said probably not really?
> A Uh-huh, yes.
> Q Can you explain a little bit to us about what you mean by that?
> A Well, when it all started, you know, I was thinking about when we did it, when we turned him in in '75 and the kind of problems that we went through and the way we wasn't believed and the way we felt we had done something wrong. I really didn't want my family going through that.
> Q Is it fair to say you were less than forthcoming with the police officers about what you knew?
> A Yes.
> Q Did there come a time within a few days or a few weeks where you decided to tell the police what you knew?
> A Yes.
> Q What made you decide to tell them what was going on?
> A Because I had found out the things about my daughter, the medical exams and stuff. I figured if they was going to listen and take care of it, then let's get it over with.

(Exhibit D, R.T. 9/19/02 at 123-124.)

Accordingly, the evidence that D.P. had originally denied the allegations is not new, and cannot form the basis for a showing of actual innocence under *Schlup*.

Moreover, there was substantial evidence beyond D.P.'s trial testimony to show Petitioner's guilt on these counts.

There was evidence of a longstanding incestuous relationship between Petitioner and D.P.. For example, the victim C.G. testified on a family trip that she observed Petitioner have D.P. perform oral sex on him, then he had D.P. and C.G. fondle each other, and then Petitioner had intercourse with C.G. and D.P.. (Exhibit D, R.T. 9/19/02 at 33-34.)

The victim C.U. testified that Petitioner had asked to have sex with her and D.P. (Exhibit D, R.T. 9/19/02 at 76.) C.U. testified she observed Petitioner fondling D.P.'s vagina, and that Petitioner told her he "would consistently have sex with D.P." (*Id.* at

14

77.)

The victim T.B. testified that she had observed D.P. and Petitioner engaged in sexual acts on two occasions. (Exhibit D, R.T. 9/19/02 at 155.)   T.B. also testified that when complaining to D.P. of abuse by Petitioner, D.P. told her that she had turned the Petitioner in for abuse before "and it didn't do any good."  (Exhibit D, R.T. 9/19/02 at 157.)  T.B. also testified that Petitioner had told her "that he had gotten [D.P.] pregnant and made her have an abortion when she was 19."  (Exhibit E, R.T. 9/23/02 at 15.)

**Denials by L.P.** – In addition to asserting that the victim L.P. denied any misconduct to investigators, Petitioner presents a statement by the victim L.P. from 2009, denying that Petitioner engaged in sexual intercourse with her, and arguing that her abraded hymen resulted from her scratching herself because of a yeast infection. (Petition, Doc. 1-1, Attachments at 3-4.)  L.P. was listed as the victim in Counts 1, 2 and 3 of the indictment.  In Count 1, Petitioner was charged with fondling the breast of L.P., in Count 2 Petitioner was charged with fondling her genitals, in Count 3 Petitioner was charged with engaging in sexual intercourse with L.P., in particular vaginal penetration. (Exhibit X, Indictment.)

L.P., who was nine years old at the time of trial, did not proffer any testimony at trial of intercourse with Petitioner.  (*See* Exhibit C, R.T. 9/18/02 at 126, *et seq.*)  At most, L.P. proffered testimony that Petitioner touched her on her "private."  (*Id.* at 134-136.) However, the prosecution also offered a videotaped interview of L.P., which Petitioner described in his Opening Brief on direct appeal as follows:

> In the videotape (between 10:33:00 - 10:36:00) [L.P.] described an incident which occurred at Appellant's home in Phoenix when [L.P.] was in the first grade. She was sleeping in her parent's room when she was awakened by Appellant touching her on her "fish" (she pointed to the vaginal area on the doll provided by Ms. Dutton) with his hand. [L.P.] told Ms. Dutton that the touching was under her clothing and hurt, like a pinching sensation.

(Exhibit I, Opening Brief at 5.)  At trial, L.P. demonstrated a marked reticence to talk about Petitioner.  For example, L.P. would readily say that other family members were nice, that she was not afraid of them, and they had never put anything in her private

areas.  (Exhibit D, R.T. 9/19/02 at 143-145.)  With regard to Petitioner, however, L.P. responded:

> Q  [L.P.], before we took our break, I was asking you how you felt when you thought about your grandpa.  Tell me again how you feel when you think about him?
> A  I feel like he's going to hurt me.
> Q  Why do you feel like he's going to hurt you?
> A  I don't know.
> Q  Has he hurt you in the past?  Let me say that again.  Has he hurt you sometime before today?
> A  I don't know.

(*Id.* at 142.)

> Q  What about grandpa, is he nice?
> A  Yes, kind of.
> Q  Kind of.  Are you afraid of him?
> A  Yes.
> Q  Has [he] ever done anything to hurt you?
> A  I don't know.
> Q  Has [he] ever put his hands in your private?
> A  I don't know.
> Q  Has [he] ever put anything in your private?
> A  I don't know.

(Exhibit D, R.T. 9/19/02 at 145-146.)

In addition to this testimony, the prosecution presented corroborative testimony by K.P., L.P.'s older brother, that he had observed Petitioner fondling L.P.'s breast and genitals (the conduct alleged in Counts 1 and 2).  Further, the prosecution presented testimony by Dr. Coffman, a pediatrician who examined L.P., which Petitioner correctly summarized on direct appeal as follows:

> In an effort to establish Count 3 the state also called Dr. Catherine Coffman, a pediatrician at St. Joseph's Hospital who examined [L.P.] on August 30, 2001. In the doctor's opinion, [L.P.]' s exam revealed an abnormal hymen which was missing tissue between the 2 o'clock and 4 o'clock positions. RT 9-19-02 at 12-13. In Dr. Coffman's opinion, the condition of [L.P.]'s hymen was not a normal variant but was caused by something which penetrated the hymen. *Id.* at 15. The doctor did not know when the injuries occurred to [L.P.]'s hymen. *Id.* at 21. No medical history was received on [L.P.] and Dr. Coffman could not determine whether there was a prior injury to the hymen. *Id.*

(Exhibit I, Opening Brief at 5.)  In addition, the victim C.U. testified that the victim L.P. had gone missing, her parents were searching the neighborhood, and two and a half

hours later, she observed when the victim K.P. went to Petitioner's bedroom, tried to open the door but it was locked, knocked, and yelled for Petitioner three times.  Three to five minutes later, Petitioner opened the door dressed in his underwear, and L.P. was laying on the bed looking scared.  She did not move until Petitioner told her she could leave.  (Exhibit A, R.T. 8/8/02 at 46-49.)

**Unpersuasiveness of Recantations** - Finally, while recantations are not categorically precluded from providing new evidence establishing actual innocence, they do come with an inherent lack of credibility.

> As a general matter, "[r]ecantation testimony is properly viewed with great suspicion." "Recanting testimony is easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial." "It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives...." For these reasons, a witness' "later recantation of his trial testimony does not render his earlier testimony false." Rather, a witness' recantation is considered in addition to his trial testimony and in the context in which he recanted when assessing the likely impact it would have on jurors.

*Jones v. Taylor,* 763 F.3d 1242, 1248 (9th Cir. 2014) (citations omitted).

Here, the overwhelming evidence at trial demonstrated that Petitioner managed to groom, intimidate, coerce, and bribe family members from a young age, so that he could engage in sexual conduct with them without impunity.  That they were or are reticent to incriminate a father figure who they feared, were dependent upon, and who previously escaped consequences from reports to the police, and to admit their involvement in incest, would hardly be surprising.  (*See e.g.*  Exhibit A, R.T. 8/8/02 at 32-34 (testimony by D.P. of reporting Petitioner to Tucson police, but being returned to the home and again be molested).)

Detective Barker, the child abuse investigator who interviewed L.P. during the pretrial investigation, testified to the nature of relationships between children and their abusers, and the resulting reticence to incriminate the abuser:

> Q   Okay. If I made the following statement to you: Children always tell as soon as it happens, would you respond that that is realty or a myth?

> A That's a myth.
>
> Q Explain what you mean by that?
>
> A Oftentimes, children, you have what's called delayed disclosure, that is mainly of the reports I get. A lot of times people think, in their head, that if a child, whatever age they are, the perpetrator commits an offense against them, they're going to tell their mom or dad right away. That is not the case.
>
> And the reason for that happening is that there's a process that goes through before -- mainly before the perpetrator would commit a crime against a child, and they do for example, the closer the relationship is, the harder it is for the child to tell. The child might be feeling guilty, that they caused it. They might believe -- they might think that nobody's going to believe them. Oftentimes what happens, when they think these things in their mind, they never tell. Subsequently, we have people that go through their whole lives, who never tell what happened to them.

(Exhibit C, R.T. 9/18/02 at 29.)   Barker went on to describe the reaction of abused children when the abuse is accidentally disclosed (e.g. by another person observing the abuse):

> Q Are you calling it accidental because it's not the child who is coming forward?
>
> A Exactly.
>
> Q How can an accidental -- or does an accidental disclosure situation actually impact the amount of information you're able to get from a child during the course of a forensic interview?
>
> A It's going to impact differently, but it is going to probably be harder for us, I would say, because this child -- I've had cases where I've had movies that the perpetrator has made. I've watched them, watch this girl get molested, and when I interview her, she says nothing happened. So that happens.

(Exhibit C, R.T. 9/18/02 at 31.)

Thus, even if evidence of D.P.'s and L.P.'s denials prior to and subsequent to trial were presented, a reasonable juror could disregard them, and rely upon the testimony presented at trial (both from these victims and the other witnesses) showing Petitioner's guilt.

Based on the foregoing, the undersigned concludes that Petitioner fails to proffer reliable new evidence which establishes that no reasonable juror could have found Petitioner guilty of the charges concerning D.P. and L.P..

**Summary** – Based upon the foregoing, the undersigned concludes that Petitioner has failed to meet his burden of showing his actual innocence.

**7.  Summary re Statute of Limitations**

Taking into account the available statutory tolling, Petitioner's one year habeas limitations period commenced running on September 1, 2004 on the conclusion of direct review, and expired on August 31, 2005, making his Petition, filed November 7, 2013 (Doc. 1), over eight years delinquent.  Petitioner's post-conviction proceedings were all commenced after the expiration of his limitations period expired, and did not revive the limitations period.  The purported "jurisdictional" nature of Petitioner's claims do not avoid the limitations bar, and Petitioner has filed to show grounds for equitable tolling.  Further, Petitioner has failed to show his actual innocence to avoid the effect of the bar.  Accordingly, the Petition must be dismissed with prejudice.

**B.  OTHER DEFENSES**

In addition to relying on the statute of limitations, Respondents argue that portions of the claims are not federal claims and thus not cognizable on habeas review, and that Petitioner has procedurally defaulted on his state remedies.  Because the undersigned finds the Petition plainly barred by the habeas statute of limitations, these other defenses are not reached.

## IV.  CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment.  The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner.  Accordingly, a

decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

**Standard Not Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be on procedural grounds. Under the reasoning set forth herein, the jurists of reason would not find it debatable whether the district court was correct in its procedural ruling

Accordingly, to the extent that the Court adopts this Report & Recommendation as to the Petition, a certificate of appealability should be denied.


# V. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the Petitioner's Petition for Writ of Habeas Corpus, filed November 7, 2013 (Doc. 1) be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that, to the extent the foregoing findings and recommendations are adopted in the District Court's order, a Certificate of Appealability be **DENIED**.

1

## VI. EFFECT OF RECOMMENDATION

2      This recommendation is not an order that is immediately appealable to the Ninth

3  Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules*

4  *of Appellate Procedure*, should not be filed until entry of the district court's judgment.

5      However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties

6  shall have fourteen (14) days from the date of service of a copy of this recommendation

7  within which to file specific written objections with the Court.  *See also* Rule 8(b), Rules

8  Governing Section 2254 Proceedings.  Thereafter, the parties have fourteen (14) days

9  within which to file a response to the objections.  Failure to timely file objections to any

10  findings or recommendations of the Magistrate Judge will be considered a waiver of a

11  party's right to *de novo* consideration of the issues,  *see United States v. Reyna-Tapia*,

12  328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*),  and will constitute a waiver of a party's

13  right to appellate review of the findings of fact in an order or judgment entered pursuant

14  to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-

15  47 (9th Cir. 2007).

16

17  Dated: January 27, 2015

18  13-2278r RR 15 01 15 on HC.docx

_____
James F. Metcalf
United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28