1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

9  Alfred Copeland,                                    No. CV-13-02278-PHX-PGR

10                     Petitioner,            **ORDER**

11  v.

12  Charles L. Ryan, et al.,

13                     Respondents.

14

15          The Court has before it the Report and Recommendation on Petition for Writ of

16  Habeas Corpus (Doc. 21), the Petitioner's Objections to the Report and Recommendation

17  (Doc. 22), and the Appendix to Petitioner's Objections (Doc. 27).  The Court also has

18  reviewed the entire record in this case.  For the reasons discussed below, the Court will

19  accept and adopt in part and reject in part the Report and Recommendation; will dismiss

20  in part the Petition for Writ of Habeas Corpus; and will refer this case to the Magistrate

21  Judge for an evidentiary hearing.

22  A.    Equitable Tolling

23          Alfred Copeland objects to the Report and Recommendation ("R&R") finding that

24  his habeas petition was delinquent.  Copeland does not contest the R&R finding that the

25  one year state of limitations for filing a federal habeas petition ran in August 2005; that

26  he was not entitled to statutory tolling; and that his Petition, filed November 7, 2013, was

27  therefore over eight years delinquent.  Rather, Copeland contends that he is entitled to

28  equitable tolling.

1   To be entitled to equitable tolling, Copeland must establish both the existence of

2   extraordinary circumstances, and that he pursued his rights diligently.  *See Ramirez v.*

3   *Yates*, 571 F.3d 993, 997 (9th Cir. 2009).  Copeland contends that he meets these

4   requirements because he "has pursued redress by state and federal proceedings diligently

5   after the appearance in 2009 of new evidence, i.e., the Affidavits recanting and refuting

6   the testimonial evidence upon which the convictions for Counts 3, 5, 7 and 8, 11

7   depended."  (Doc. 27 at 2.)  The "affidavits" to which Copeland refers are actually

8   notarized statements from D.P., L.P., and Bobby Copeland.  (*See* Doc. 1 at 28; Doc. 1-1

9   at 3-6.)

10   Assuming that the "appearance" of these statements constitutes extraordinary

11   circumstances,[1] Copeland has not met his burden of demonstrating that he pursued his

12   rights diligently.  Copeland's trial was held in 2002, and he has neither claimed, nor

13   provided an explanation as to why, he was unable to previously obtain these statements

14   dated June, July, and August 2009 (Doc. 15-5 at 116, 119-122), almost seven years after

15   he was convicted.

16   Further, even if Copeland was unable to obtain these statements prior to 2009, the

17   Arizona Court of Appeals summarily denied review of his claim on January 4, 2013 (*see*

18   Doc. 15-5 at 166), yet Copeland did not file his federal habeas petition until

19   November 7, 2013, more than ten months later.  Copeland contends that he needed this

20   ten month period "to properly familiarize himself with the federal habeas laws applicable

21   to his issues so as to properly present them in this court" and that "only today is he aware

22   that the court may limit the habeas petition to be filed within 30 days of the final decision

23   of the state court of last resort."  (Doc. 27 at 2.)  Copeland's unfamiliarity with the law

24   does not, however, excuse his failure to promptly file his federal habeas petition.  *See*

25   

26   [1] Although Copeland did not argue before the Magistrate Judge that the "appearance" of the notarized statements constitute extraordinary circumstances entitling

27   him to equitable tolling, the Court will exercise its discretion to address the argument. *See United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (district court may decline

28   to consider new arguments raised for the first time in Objections to Magistrate Judge's Report and Recommendation).

*Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006) ("pro se petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling").

The Court finds the ten month delay between the state court's decision and the filing of the federal habeas petition demonstrates a lack of diligence in pursuing his rights. *See Guillory v. Roe*, 329 F.3d 1015, 1018 n.1 (9th Cir. 2003) (finding lack of diligence where petitioner waited seven months after state court's decision to return to federal court, noting that "thirty days is sufficient time for a petitioner to return to federal court following final action by the state courts"). Copeland is not, therefore, entitled to equitable tolling.

B.     Jurisdiction of State Trial Court

Copeland contends that his claim for relief based on lack of subject matter jurisdiction over 9 of the 11 indicted counts "should not be denied because an absence of jurisdiction" is cognizable in an action for federal habeas relief and renders the judgment against him "void and unenforceable." (Doc. 27 at 2-3.) Copeland argues that ground 7 of his petition, in which he claimed that the state trial court lacked subject matter jurisdiction because the indictment was invalid on its face, should survive any perceived procedural bar because lack of subject matter jurisdiction can be raised at any time. (Doc. 27 at 3.) Copeland also appears to argue that ground 3 (arguing that he was not in Arizona during the relevant time period) and ground 4 (that the statute of limitations had run prior to the date that he was prosecuted) of his petition also should survive any procedural bar because they also are "jurisdictional." (*See id.*)

As the Magistrate Judge concluded, the mere assertion by Copeland that these claims are "jurisdictional" in nature does not avoid the requirement that the claims be properly exhausted and timely raised in a federal habeas petition. *See Chapman v. Bradt*, 2015 WL 1211683, at *10-*11 (W.D.N.Y 2015) (finding that claim that indictment was jurisdictionally defective was procedurally defaulted and thus barred from review in federal habeas). Moreover, Copeland's contention that he was not in Arizona during the relevant time raises a sufficiency of the evidence argument rather than a jurisdictional

argument, and his contention that the statute of limitations had run is not cognizable in federal habeas because it relies on requirements of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("federal habeas corpus relief does not lie for errors of state law").

Finally, even if Copeland's defective indictment claims were not procedurally defaulted, the defects alleged by Copeland are not of the type that would deprive the state court of jurisdiction and thus are not cognizable in federal habeas. *See Pyle v. Johnston*, 137 F.2d 869, 870 (9th Cir. 1943) ("if a court passing sentence had jurisdiction over the person of the defendant and over the offense which the indictment undertook to define, its judgment of conviction is not subject to collateral attack by habeas corpus proceedings on the ground that the indictment fails to charge an offense, unless the court was so completely without jurisdiction that its proceedings were void"); *see also Evans v. Cain*, 577 F.3d 620, 624 (5th Cir. 2009) (sufficiency of state indictment not a matter for federal habeas relief unless indictment is so defective that convicting court had no jurisdiction); *Heath v. Jones*, 863 F.2d 815, 821 (11th Cir. 1989) (same).

Copeland contends that Count 1 of the indictment was defective because it failed to list the element of causation. The Court disagrees and finds that Count 1 sufficiently set forth the charged offense by alleging that Copeland had "intentionally or knowingly engaged" in "direct or indirect touching, fondling, or manipulating of any part of the female breast" of L.P., "a minor under the age of fifteen years of age, in violation of A.R.S. §[] 13-1404 . . . ." *See* A.R.S. § 13-1404(A), (B) ("A person commits sexual abuse by intentionally or knowingly engaging in sexual contact with . . . any person who is under fifteen years of age if the sexual contact involves only the female breast."); *see also United States v. Zavala*, 839 F.2d 523, 526 (9th Cir. 1988) (an indictment generally is sufficient if it tracks the language of the statute).

Copeland contends that Count 3 of the indictment was defective because it failed to allege that L.P. was under the age of 12 years. However, a review of the statute under which Copeland was tried and convicted in Count 3 demonstrates that the indictment sufficiently set forth the charged offense by alleging that Copeland "intentionally or

knowingly engaged in sexual intercourse or oral sexual contact" with L.P., "who was a minor under the age of fifteen years, (to-wit: vaginal penetration)." *See* A.R.S. § 13-1405(A) ("A person commits sexual conduct with a minor by intentionally or knowingly engaging in sexual intercourse or oral sexual contact with any person who is under eighteen years of age."); A.R.S. § 13-1405(B) ("Sexual conduct with a minor who is under fifteen years of age is a class 2 felony and is punishable pursuant to § 13-705."). The factor of "under twelve years of age" is a sentencing factor and did not need to be set forth in the indictment. *See* A.R.S. § 13-705(A) ("A person who is at least eighteen years of age and who is convicted of . . . sexual conduct with a minor who is twelve years of age or younger shall be sentenced to life imprisonment. . . ."); *Almendarez–Torres v. United States*, 523 U.S. 224, 228 (1998) (although indictment must plead all elements of a crime, it "need not set forth factors relevant only to the sentencing of an offender found guilty of the charged crime").

Copeland contends that Count 5 of the indictment was defective because it contained a time frame that was too broad. The Court disagrees and finds that Count 5 sufficiently set forth the time span of the offense by stating that "on or between the 2nd day of April, 1984, and the 2nd day of April, 1985," Copeland "knowingly recorded a visual or print medium, (to wit: Polaroid photos) in which [T.B.], a minor under the age of fifteen, was engaged in sexual conduct." *See Dilworth v. Markle*, 970 F.Supp.2d 498, 508 (N.D.W.Va. 2013) (indictment sufficient that charged state prisoner "with sexually touching his stepdaughter on ten separate occasions in 2001"); *Voymas v. Unger*, 2011 WL 26700233, at *5 (W.D.N.Y. 2011) (one year time span on sexual abuse charge was not unreasonable because victim was child).

C.    Actual Innocence

Copeland asserts "actual innocence" as a basis to avoid the procedural default of his claims and to overcome the habeas statute of limitations bar.[2] Specifically, Copeland

---

[2] To the extent Copeland is seeking to make a freestanding claim of actual innocence, such a claim is not cognizable in this non-capital federal habeas case. *See*

contends (1) that he was not in Arizona during the time of some of the offenses on which he was convicted, (2) that some of the victims originally told the police that nothing criminal happened, and (3) that two of the victims now deny that the abuse of which he was convicted ever happened.  (*See* Doc. 1 at 28; Doc. 1-1 at 3-6; *see also* Doc. 23, 24, 26.)

To excuse procedural default or overcome the habeas statute of limitations bar based on a claim of actual innocence, a federal habeas petitioner has the burden of presenting new reliable evidence "of innocence so strong that a court cannot have confidence in the outcome of trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013); *see Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995).  "'[T]enable actual-innocence gateway pleas are rare.'"  *Stewart v. Cate*, 757 F.3d 929 (9th Cir. 2014) (quoting *McQuiggin*, 133 S. Ct. at 1928).  A petitioner must "persuade the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  *McQuiggin*, 133 S. Ct. at 1928.  To determine

---

*Schlup*, 513 U.S. at 315 (actual "innocence does not be itself provide a basis for relief" but is "instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits"); *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) ("The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review."); *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004) (newly discovered evidence not grounds for federal habeas relief absent independent constitutional violation); *Johnson v. Bett*, 349 F.3d 1030, 1038 (7th Cir. 2003) ("For claims based on newly discovered evidence to state a ground for federal habeas relief, they must relate to a constitutional violation independent of any claim of innocence."); *Rouse v. Lee*, 339 F.3d 238, 255 (4th Cir. 2003) ("claims of actual innocence are not grounds for habeas relief even in a capital case"); *David v. Hall*, 318 F.3d 343, 347-48 (1st Cir. 2003) ("The actual innocence rubric . . .has been firmly disallowed by the Supreme Court as an independent ground of habeas relief, save (possibly) in extraordinary circumstances in a capital case."); *Burton v. Dormire*, 295 F.3d 839, 848 (8th Cir. 2002) ("[W]e have squarely rejected the notion that a prisoner may receive a writ simply because he claims he is innocent."); *LaFevers v. Gibson*, 238 F.3d 1263, 1265 n.4 (10th Cir. 2001) ("[A]n assertion of actual innocence, although operating as a potential pathway for reaching otherwise defaulted constitutional claims, does not, standing alone, support the granting of the writ of habeas corpus.").

whether a petitioner has met this burden, the Court must "'assess how reasonable jurors would react to the overall, newly supplemented record,' including all the evidence the petitioner now proffers." *Stewart*, 757 F.3d at 938 (quoting *Lee v. Lampert*, 653 F.3d 929, 945 (9th Cir. 2011)).   A petitioner must make the showing of actual innocence on each of the charges for which he seeks relief. *See Vosgien v. Persson*, 742 F.3d 1131, 1136-37 (9th Cir. 2014).

The Magistrate Judge found that Copeland had not met his burden of demonstrating actual innocence. (*See* Doc. 21 at 10-18.) Copeland contends that it was premature and improper for the Magistrate Judge to dismiss the recantations of the witnesses' trial testimony[3] as not credible or persuasive without conducting a hearing on the issue. (Doc. 21 at 3-4.)

       1.    <u>Dates Copeland was purportedly not in Arizona</u>

Copeland has submitted new evidence that indicates that he did not live in Arizona during the period of March 1979 to September 1984. Specifically, Copeland has submitted notarized statements from his daughter, D.P., and his brother, Bobby Copeland, stating that Copeland lived in Houston, Texas from March 1979 to September 1984. (Doc. 1-1 at 5-6.) In Ground 3 of his petition, Copeland contends that, based on this new evidence, no reasonable juror could have found him guilty of Counts 7 and 8 of the indictment. (Doc. 1 at 8.) Count 5 of the indictment also appears to be implicated by this evidence and thus also will be discussed.

          a.    <u>Count 5 – Photos of T.B.</u>

Count 5 of the indictment charges that "on or between the 2nd day of April, 1984,

---

[3] Copeland also refers to these witnesses' pretrial statements in connection with his actual innocence argument. Although the pretrial statements can be considered in conjunction with all of the other evidence, including the newly-submitted evidence, in determining whether Copeland has met his burden of demonstrating actual innocence, the pretrial statements to which he refers are not *new evidence* and thus those statements cannot form the basis for a showing of actual innocence. *See Schlup*, 513 U.S. at 327 (requiring petitioner to show "it is more likely than not that no reasonable juror would have convicted him in light of the *new evidence*" (emphasis added).)

and the 2ⁿᵈ day of April, 1985," Copeland "knowingly recorded a visual or print medium, (to wit: Polaroid photos) in which [T.B.], a minor under the age of fifteen, was engaged in sexual conduct." (Doc. 1 at 18.) At trial, T.B. testified that Copeland took sexually explicit photos of her posing nude for him when they were living in "Phoenix, on Vernon Avenue," when she was either "12 or 13" years old. (Doc. 15-4 at 4.) She remembered how old she was because she had gone through puberty and it "was at least a year and a half before [she] moved out of his house." *Id.* T.B. testified that she was born in 1974 (Doc. 15-3 at 149), and that at the time of trial in September 2002, she was 28 years old (Doc. 15-3 at 147).[4] Based on this testimony, the photos of T.B. were taken by Copeland in either 1986 or 1987. This falls outside of the dates the newly submitted evidence indicates that Copeland was living in Texas. Accordingly, the newly submitted evidence does not establish Copeland's actual innocence of the conduct alleged in Count 5.[5]

### b.    Counts 7 and 8 – Sexual Conduct with C.U.

Counts 7 and 8 of the indictment charge that "on or between the 9ᵗʰ day of July, 1983 and the 8ᵗʰ day of July, 1984," Copeland engaged in sexual conduct with C.U. without her consent by fondling her breasts (Count 7 of the indictment) and fondling her genitals (Count 8 o the indictment). (Doc. 1 at 19.) At trial, C.U. testified that she was born on July 9, 1966, and that at the time of trial (September 2002), she was 36 years old

---

[4] Although the Magistrate Judge stated that T.B.'s testimony was contradictory about her present age because she had testified that she was born in 1974, "making her 38 years old" at the time of the trial (*see* Doc. 21 at 11), this statement was based on an apparent miscalculation by the Magistrate Judge.

[5] Although T.B. testified the offense occurred on dates that are outside the dates specified in the indictment, this variance in dates is not fatal to the conviction. *See Arnold v. United States*, 336 F.2d 347, 352 (9ᵗʰ Cir. 1964) (variance not material where "allegation and proof substantially correspond, where the variance is not of the character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense"); *see also United States v. Auerbach*, 913 F.2d 407, 414 (7th Cir. 1990) (evidence was sufficient for marijuana possession conviction despite variance between dates alleged in indictment and proved at trial). Further, the variance in dates does not establish Copeland's actual innocence of the offense.

(Doc. 15-3 at 66-67.)  C.U. testified that her son was born on August 1, 1983, when she was 17 years old.  (*Id.* at 75.)  She testified that she was living with Copeland on Buckeye Road between the time that her son was born and he turned one year old, and that during that time period, "[b]efore I turned 18," Copeland "grabbed my chest and he grabbed my vagina over my clothes" after she refused to have sex with him.  (*Id.*at 75-77.)  Thus, based on C.U.'s testimony at trial regarding her age and her son's age, the conduct charged in Counts 7 and 8 occurred sometime between August 1, 1983, and July 9, 1984, on Buckeye Road in Arizona.  According to the newly submitted statement, Copeland resided in Texas until September 1984.

However, C.U. also testified about uncharged incidents that occurred at Copeland's home in Houston, Texas, when she was 13 or 14 years old (Doc. 15-3 at 74-75, 76-78, 80), which would have been in 1979 or 1980.  This is consistent with the dates set forth in the newly submitted evidence regarding when Copeland resided in Texas.

Further, C.U. was unequivocal in her trial testimony that the charged conduct occurred at the home on Buckeye Road, Arizona.  Although she testified that it occurred when she was still 17 years old, she testified at a pretrial hearing that the charged conduct occurred in "September of '84" when "we moved from Houston to Phoenix, Arizona" and while she was staying with Copeland for a period of "about two months."  (Doc. 15-1 at 44-46.)  Although C.U.'s testimony is somewhat inconsistent, a reasonable juror could believe that Copeland was in Texas until September 1984, and still believe C.U.'s testimony that the charged conduct of Counts 7 and 8 occurred while Copeland was living in Arizona.  As the Magistrate Judge found, "[a] reasonable juror could simply conclude that C.U. was mistaken about her age and the age of her son at the time of the events," but that that C.U. was correct that the events occurred in Arizona, at the Buckeye home, and that they occurred in or after September 1984, after Copeland had moved to Arizona from Texas.  The slight variance in dates is particularly understandable given that the incident had occurred 18 years prior to the date C.U. testified at trial.

Finally, as the Magistrate Judge noted, the charges in Counts 7 and 8 were for

sexual abuse, and did not allege or require that C.U. was a minor at the time of the offense.  Thus, that C.U. may have been 18 years old rather than 17 at the time of the conduct does not demonstrate actual innocence of the conduct alleged in Counts 7 and 8 of the indictment.

        2.    <u>Recantation by D.P.</u>

Count 6 of the indictment charges Copeland with incest involving D.P., his daughter, occurring "on or between the 1st day of January, 2001and the 24th day of August, 2001."  (Doc. 1 at 18-19.)  In Ground 1 of his habeas petition, Copeland has raised claims related to his conviction of Count 6.  Specifically, he alleges that his trial counsel was ineffective for failing to obtain and present exculpatory evidence at trial, and that his appellate counsel was ineffective because he was operating under an actual conflict of interest in that his counsel's firm represented both himself and D.P.  (Doc. 1 at 6.)

Copeland has, in support of his claim of actual innocence of Count 6, submitted a notarized statement from D.P. stating that the charge of incest involving her "is false":

> My father Alfred Copeland was charged with and convicted of incest with me. That charge is false.  When I refused to accuse my father, the detective called me a liar.  That is contained in the PPD report.  After that I was arrested on a Class 6 Felony for Failure to Protect and Hampering an Investigation.  My daughter was taken from me and placed with AZ CPS.  I was held in the Maricopa County Jail for 3 months.  The D.A. in the case Jeanine Sorrentino told me that if I didn't say what they wanted me to, she would see to it that I got 25 year[s] in ASPC.  Not knowing any better I gave in.

(Doc. 1 at 28.)

At trial, D.P. testified that she lived with Copeland pretty much her entire life, and that her father's sexual conduct with her began when she was around five years old; that he took her virginity in about 1976, when she was around 13 years old; and that the last time she had sex with her father was sometime in the summer of 2001, about a month before he was arrested.  (Doc. 15-3 at 98-100, 114-22.)

D.P. also testified that when she first started talking to detectives in the summer of

2001, she initially was not cooperative with them and was less than forthcoming with what had happened, explaining that it was because she "felt dirty," because she "figured everybody else would consider all of it a pretty nasty thing too," and because of the problems that she experienced with not being believed when she and her sister had previously (in 1975) reported her father's sexual misconduct to the police.  (*See* Doc. 15-3 at 123-25.)  D.P. testified that she decided to tell the police in 2001 what had been going on with her father after she "found out the things about my daughter [L.P.], the medical exams and stuff.  I figured if they was going to listen and take care of it, then let's get it over with."  (*Id.* at 124-25.)  She testified that she then "came clean about my recent sexual behavior with my father."  (*Id.* at 125.)

D.P. testified that, as a result of her initial uncooperativeness and failure to report the conduct, and then her subsequent disclosure of what had happened, she was arrested and was being prosecuted for obstruction of justice.  (*Id.* at 126.)  When asked why, if she was being prosecuted for obstruction of justice, she was there testifying against her father, D.P. responded, "Because my father has been getting away with this for far too long and he's ruined too many lives."  (*Id.* at 127.)  D.P. testified that she wanted him put "behind bars" to "pay for what he [has] done" and that she would "like to see him put away for as long as possible."  (*Id.* at 134.)

D.P. denied that she was testifying to help herself out in her own case, and stated that instead she was testifying "[b]ecause he's been doing this for about 30 years."  (*Id.* at 137.)  D.P. further explained that she is the one who decided to come down to talk to the detectives again after her initial denial and to come clean, and that she did this before she was arrested and before she was charged with obstruction of justice.  (*Id.*  at 138-39.)  She "called them and talked to them about coming down and talking to them," and that when she came down, she told them "about the on-going sexual abuse that [her] father perpetrated against" her.  (*Id.*)  She further testified that although her daughter, L.P., was taken from her in August 2001, a guardian ad litem was appointed for L.P. by the State of Arizona; that it was the guardian ad litem and not the prosecutor who made the decision

1   that L.P. should return home to D.P.; and that, to her knowledge, the prosecutor did not

2   have anything to do with the timing of L.P. being returned to D.P.  (*Id.* at 140-41.)

3          In addition to D.P.'s testimony, there was testimony by other witnesses about the

4   longstanding incestuous relationship between Copeland and D.P.  Victim C.G. testified

5   that on a family trip she observed Copeland have D.P. perform oral sex on him; that

6   Copeland had D.P. and C.G. fondle each other in his presence; and that Copeland then

7   had intercourse with both C.G. and D.P.  (Doc. 15-3 at 33-35.)  Victim C.U. testified that

8   she observed Copeland fondling D.P.'s vagina and also that Copeland told C.U. he

9   "would consistently have sex with D.P." (*Id.* at 77-78).  Victim T.B. testified she

10  observed Copeland and D.P. engage in sexual acts on two separate occasions (*id.* at 156-

11  57); that D.P. told T.B. that she had previously turned Copeland in for abuse "and it

12  didn't do any good" (*id.* at 158); and that Copeland told T.B. "that he had gotten [D.P.]

13  pregnant and made her have an abortion when she was 19" (Doc. 15-4 at 16).  Victim

14  K.C. testified that D.P. told him that Copeland had molested her since she was about 12,

15  and had molested all the girls in the family.  (Doc. 15-2 at 92.)

16         There is no doubt that the evidence at trial regarding Copeland's acts of incest

17  with D.P. over the years was strong and extensive.  However, Copeland was convicted of

18  incest on or between the periods of January 1, 2001, and August 24, 2001.  The only

19  evidence regarding incest during that particular time came from D.P.

20         Although D.P's "'later recantation of [her] trial testimony does not render [her]

21  earlier testimony false,'" *Jones*, 763 F.3d at 1248 (citations omitted), the Court will, at

22  this point, assume the reasons given by D.P. for her trial testimony are true, *see Stewart*,

23  757 F.3d at 942 ("newly-presented evidence giving rise to a *Schlup* gateway innocence

24  claim may require a credibility assessment"; to determine whether an evidentiary hearing

25  is needed, district court may assume "newly-presented evidence was credible and

26  thoroughly evaluate[] his actual innocence claim in light of the newly-presented

27  evidence").  With this assumption of truth, D.P.'s newly-submitted statement causes the

28  Court to lose confidence in Copeland's conviction of incest with D.P. during the 2001

time period.  Specifically, it is unlikely that any reasonable juror would have convicted Copeland of Count 6 if the juror had testimony from D.P., and found such testimony credible, that:  (1) the charge of incest in 2001 was false; (2) that when D.P. refused to accuse her father of the incest in 2001, she was called a liar by law enforcement and was arrested and charged with a felony for failing to protect her daughter and hampering an investigation; (3) that her daughter was taken from her and placed with child protective services; (4) that D.P. was held in the Maricopa County Jail for a period of three months; (5) that the prosecutor threatened that D.P. would get 25 years in prison if she didn't testify the way the state wanted her to; and (6) that D.P. gave in and testified at trial the way the State wanted her to.

The Court will grant an evidentiary hearing at which Copeland will have the opportunity to present evidence regarding his actual innocence of Count 6 for the purpose of seeking to excuse his procedural default and overcome the statute of limitations bar on those portions of Ground 1 of his habeas petition related to Count 6. *See Schlup*, 513 U.S. at 327; 341-42; *Lee*, 653 F.3d at 932.

### 3.   Recantation by L.P.

Count 3 of the indictment charges that Copeland "intentionally or knowingly engaged in sexual intercourse or oral sexual contact with [L.P.], who was a minor under the age of fifteen years, (to wit: vaginal penetration)."  (Doc. 1 at 17-18.)  In Ground 2 of his petition, Copeland raises claims related to his conviction of Count 3.  Specifically, he alleges that his trial counsel was ineffective for failing to secure and present statements from L.P. that the conduct alleged in Count 3 never occurred, and failing to investigate and present medical evidence, including medical records, that L.P. had been "treated in August 2001 for a severe yeast infection, the itching and scratching of which was the likely source of the hymenal abnormality."[6]  (Doc. 1 at 7.)

---

[6]  Copeland also contends that trial counsel failed to present available "impeachment evidence against the experts" (Doc. 1 at 7), but does not specify the evidence to which he is referring.

Copeland has, in support of his claim of actual innocence of Count 3, submitted a notarized statement from L.P. stating that the sexual intercourse[7] with Copeland "never happened":

> In 2002, my grandfather, Alfred Copeland was accused of having sexual intercourse with me. That never happened. I am still virgin. The D.A. based this accusation on the fact that my hymen is missing. This was caused by a severe yeast infection. I scratched myself until I was bleeding. My mother took me to an emergency clinic in Aug 2001 for treatment. During the course of all these things I was taken away from my family. I was alone and scared and didn't know what to do. Now I want to correct this injustice of a lifetime sentence on my grandfather for something that did not happen.

(Doc. 1-1 at 3.)

At the time of the charged sexual conduct, L.P. was 8 years old; at the time of trial, she was 9 years old. At trial, she testified that Copeland "touched me . . . on my private," and explained, through the use of a stuffed bear, that the "private" was the part "right here in between our legs." (Doc. 15-2 at 135-36.) She further explained that the private part between a girl's legs is called "Fish" and that Copeland "touched" her on her private part between her legs; however, she also testified that she did not remember that because she was asleep but that someone else told her it happened. (*Id.* at 136-38.) L.P. testified that, other than the time she was asleep, she did not remember whether Copeland ever touched her on her private. (*Id.* at 139.)

When asked whether anything ever happened to the inside of her private, L.P. testified, "I don't remember." (*Id.* at 140.) L.P. also testified that when she thinks about her grandpa (Copeland) "I feel like he's going to hurt me," but when asked why she felt like he was going to hurt her, she responded, "I don't know," and when asked whether he had hurt her before, she again responded, "I don't know." (*Id.* at 143.) L.P. was then asked whether she was afraid of her other family members – her mother, father, brothers,

---

[7] "Sexual intercourse" is defined as meaning "penetration into the penis, vulva or anus by any part of the body or by any object or masturbatory contact with the penis or vulva." A.R.S. § 13-1401(3). Count 3 of the indictment charged "sexual intercourse" through vaginal penetration.

1    aunts, uncles - and she testified "no" as to all of them, and also testified "no" as to

2    whether any of them ever put their hands in or on her private or ever put anything in her

3    private.  (*Id.* at 144-45.)  However, when again asked about her grandpa (Copeland), L.P.

4    testified "Yes," she was afraid of him, and then responded "I don't know," to each of the

5    questions of whether he had ever done anything to hurt her, whether he ever put his hands

6    in her private, and whether he ever put anything in her private.  (*Id.* at 146-47.)

7         Wendy Dutton, a forensic interviewer with the Child Abuse Assessment Center at

8    St. Joseph's Hospital, testified at trial that she interviewed L.P. in March 2002.  This

9    interview was videotaped and played for the jury.  During this interview, "L.P. described

10   an incident when she was abruptly awakened by Copeland touching her on her genitals.

11   L.P. told Dutton during the interview that Copeland had touched her under her clothes

12   and that it hurt."[8]  (Doc. 15-5 at 7-8.)

13        Dr. Catherine Coffman, a pediatrician, testified that she examined L.P. in August

14   2001, when L.P. was eight years old.  (Doc. 15-3 at 7.)  Dr. Coffman testified that in her

15   opinion, L.P.'s hymen exam was "abnormal."  "I didn't see any acute trauma.  I didn't

16   see any trauma to the labia or anything else.  But what I saw was very little hymenal

17   tissue."  (*Id.* at 13.)  L.P.'s hymen, "there wasn't very much of it. . . .  It was narrow. . . ."

18   (*Id.* at 14.)  "What I saw in L.P., was a very, narrow hymenal – there was hymenal tissue

19   here, very narrow, and then there, there was – I didn't see any hymen really.  It was kind

20   of flush with the vaginal wall."  (*Id.*)  When asked where, in terms of the face of a clock,

21   was the absence of hymen on L.P., Dr. Coffman testified that it was absent "from about

22   2:00 to 4:00" and that "from about 4:00 around to 10:00, it was very narrow, but it was

23   still present."  (*Id.*)  She explained that she had done thousands of these types of exams

24   and she knows "when kids' hymens are narrower than they should be" and that L.P's was

25   narrower that it should have been.  (*Id.* at 15.)  Dr. Coffman opined that L.P's hymen was

26

27        [8] The videotape was admitted as State's Exhibit 11 at trial.  (*See* Doc. 15-2 at 177.)
     Although this videotape has not been submitted to this Court, the Court takes as true the
28   summary of the video by the Maricopa County Superior Court (*see* Doc. 15-5 at 7-8),
     which Copeland has not indicated is inaccurate.

1    "not a normal variant, that this is a post-traumatic finding."  (*Id.* at 16.)

2          Although Dr. Coffman could not really say for sure whether the trauma to cause

3    this type of injury would have been a one-time thing or a repeated event, her sense was

4    that it "probably would have been repeated . . . because of the complete area of the

5    hymen that was abnormal, just not one focal area, but a large – most of it was abnormal."

6    (*Id.* at 16.)  When asked whether she was able to tell what caused the injury, she

7    responded:  "Other than something penetrating through the hymen, I can't say what" and

8    that she thought it would have been painful.  (*Id.*)  When asked whether with this type of

9    injury, it was likely that something actually penetrated the vaginal canal, Dr. Coffman

10   responded, "Yes."  (*Id.* at 17.)

11         When asked whether L.P. could have caused this injury by herself by putting

12   something inside herself, Dr. Coffman explained,

13         Usually the hymen, itself, is sensitive in a painful way.  And I compare it to
14         touching your eyeball, it hurts, and people don't do it.
                 The hymen in little girls is like that.  I say that because I have made the
15         mistake of touching it with a Q-tip on several occasions.  I know the response I
16         got.  I don't think most children self-injure or do things that hurt themselves.  And
           if she were to touch her hymen in particular, she would have to injure it.  It would
17         be very painful.

18   (*Id.* at 19-20.)  Dr. Coffman opined that the injury to L.P.'s hymen is "consistent with the
19   history of abuse" that was provided to her about L.P.  (*Id.* at 20.)

20         Detective Barker, a child abuse investigator who interviewed L.P. during the

21   pretrial investigation, testified regarding the nature of relationships between children and

22   their abusers, the resulting reticence of the child to accuse the abuser, and the reaction of

23   abused children when the abuse is accidentally disclosed (e.g., disclosed by another

24   person who has observed the abuse).  (*See* Doc. 15-2 at 30-32.)

25         L.P.'s older brother, K.C., testified that he had observed Copeland fondling L.P.'s

26   breast and genitals (the conduct in Counts 1 and 2 of the indictment) while L.P. was

27   asleep on the couch next to Copeland.  (Doc. 15-2 at 95-99.)  He also testified that just a

28   few weeks prior to the date Copeland was arrested, the family did not think that L.P. had

1    come home from school, so they went out and started looking for her.  (*Id.* at 102.)  She

2    was missing for about an hour and a half, and they could not find her.  (*Id.*)  K.C. finally

3    thought to check in his grandpa's (Copeland's) bedroom to see if L.P. was in there, and

4    K.C. went and banged on the bedroom door three or four times, calling out Copeland's

5    name about three times.  (*Id.* at 102-04.)  At first there wasn't an answer, but then

6    Copeland finally opened the door about five minutes later, and asked what K.C. wanted.

7    (*Id.* at 103-04.)  K.C. saw L.P. lying on the bed on her back, staring at the ceiling.  (*Id.* at

8    104-05.)  "She just seemed like she was in a shock mode," "[j]ust kind of laying perfectly

9    still, just kind of staring at the ceiling."  (*Id.* at 105.)  She didn't move after the door was

10   opened until K.C. told her to get up and come out of there, which she did.  (*Id.*)

11       C.U., another victim, also testified about the incident when L.P. went missing.

12   C.U. testified that the family thought L.P. had come home from school but then she was

13   missing and she and other family members went looking for her through the

14   neighborhood.  (Doc. 15-3 at 83-84.)  They searched for L.P. for two to two and a half

15   hours, but no one had thought to check Copeland's bedroom.  (*Id.* at 84.)  However,

16   L.P.'s older brother, K.C., finally started knocking on Copeland's door.  (*Id.* at 85.)  After

17   at least five minutes, Copeland came to the door and asked, "What do you want?"  (*Id.*)

18   C.U. testified that she could see into the room, and saw L.P. laying on the bed on her

19   back and Copeland in his underwear and a t-shirt.  (*Id.* at 86.)  L.P. was dressed and

20   laying "perfectly still, scared," looking up at the ceiling with her arms down by her side.

21   (*Id.* at 86-87.)

22       There was extensive and strong evidence at trial of Copeland's sexual misconduct

23   with numerous victims over a period of approximately thirty years.  The evidence

24   regarding the misconduct with L.P. charged in Count 3 of the indictment was, however,

25   more limited.  Assuming the newly-submitted statement from L.P. is true, this statement

26   causes the Court to lose confidence in Copeland's conviction of sexual intercourse with

27   L.P.  Specifically, it is unlikely that any reasonable juror would have convicted Copeland

28   of sexual intercourse with L.P. if they had the additional testimony from L.P., and found

such testimony credible, that:  (1) L.P. denied that Copeland had sexual intercourse with

her; (2) that L.P.'s hymen was missing due to a severe yeast infection where she scratched herself until she bled and resulted in her being taken to an emergency clinic; and (3) that L.P. is still a virgin.[9]

The Court will grant an evidentiary hearing at which Copeland will have the opportunity to present evidence regarding his actual innocence of Count 3 for the purpose of seeking to excuse his procedural default and overcome the statute of limitations bar on Ground 2 of his habeas petition claiming ineffective assistance of counsel related to his conviction on Count 3. *See Schlup*, 513 U.S. at 327; 341-42; *Lee*, 653 F.3d at 932.

IT IS ORDERED that the Magistrate Judge's Report and Recommendation (Doc. 21) is accepted and adopted in part and rejected in part as follows:

The Court accepts and adopts the Magistrate Judge's reasoning and recommendations, as modified and supplemented by this Order, as to Grounds 3, 4, 5, 6, and 7 of the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus (Doc. 1).

The Court accepts and adopts the Magistrate Judge's reasoning and recommendations, as modified and supplemented by this Order, as to Ground 1 of the Petition for a Writ of Habeas Corpus, except to the extent that Ground 1 raises claims of ineffective assistance of counsel related to Count 6 of the indictment.

The Court accepts and adopts the Magistrate Judge's reasoning and recommendations, as modified and supplemented by this Order, as to Ground 2 of the Petition for a Writ of Habeas Corpus, except to the extent that Ground 2 raises claims of ineffective assistance of counsel related to Count 3 of the indictment

The Court rejects the Magistrate Judge's recommendation that Petitioner has not established actual innocence of Count 3 and Count 6 of the indictment

---

[9] As noted previously, sexual intercourse is defined as including "penetration into the . . . vulva . . . by any part of the body or by any object or masturbatory contact with the penis or vulva." A.R.S. § 13-1401(3). Thus, "sexual intercourse" under the statute does not necessarily foreclose L.P. still being a "virgin."

1    without the necessity of holding an evidentiary hearing.

2         IT IS FURTHER ORDERED that Ground 1 of the Petition Under 28 U.S.C.

3    § 2254 for a Writ of Habeas Corpus (Doc. 1) is DISMISSED except to the extent Ground

4    1 raises claims of ineffective assistance of counsel related to Count 6 of the indictment.

5         IT IS FURTHER ORDERED that Ground 2 of the Petition Under 28 U.S.C.

6    § 2254 for a Writ of Habeas Corpus (Doc. 1) is DISMISSED except to the extent Ground

7    2 raises claims of ineffective assistance of counsel related to Count 3 of the indictment.

8         IT IS FURTHER ORDERED that Grounds 3, 4, 5, 6, and 7 of the Petition Under

9    28 U.S.C. § 2254 for a Writ of Habeas Corpus (Doc. 1) are DISMISSED.

10        IT IS FURTHER ORDERED that Ground 1 claims of ineffective assistance of

11   counsel related to Count 6 of the indictment, and Ground 2 claims of ineffective

12   assistance of counsel related to Count 3 of the indictment, are referred back to the

13   Magistrate Judge for additional proceedings consistent with this Order, including the

14   holding of an evidentiary hearing on Petitioner's claims of actual innocence on Count 3

15   and Count 6, and any other proceedings as deemed necessary and appropriate.

16        IT IS FURTHER ORDERED that the Magistrate Judge shall appoint counsel to

17   represent Petitioner if he qualifies for such appointment under 18 U.S.C. § 3006A.  *See*

18   Rule 8(c) of the Rules Governing § 2254 Cases.

19        Dated this 29th day of June, 2015.

20

21

22

23            Paul G. Rosenblatt
             United States District Judge
24

25

26

27

28

- 19 -