Lee Stein (#12368)
lee@mscclaw.com
MITCHELL | STEIN | CAREY | CHAPMAN, PC
One Renaissance Square
2 North Central Avenue, Suite 1450
Phoenix, AZ 85004
Telephone: (602) 358-0292
Facsimile: (602) 358-0291
Attorneys for Petitioner

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Alfred Copeland, | ) CV 13-02278-PHX-JJT |
| Petitioner, | ) |
| v. | ) **PETITIONER'S BRIEF IN SUPPORT** |
| | ) **OF CLAIM OF ACTUAL** |
| David Shinn, et al., | ) **INNOCENCE** |
| Respondents. | ) |

**Preliminary Statement**

The alleged victims in Counts 3 and 6, LP and DP,[1] have unequivocally recanted their trial testimony. Both (a mother and daughter) claim to have testified untruthfully so that they could be reunited. DP, Petitioner's daughter and LP's mother, was facing obstruction charges arising out of the prosecution of Petitioner; LP, who was 9 years old at the time, had been removed from the home as a consequence. The evidence convicting Petitioner on these two counts was quite thin and primarily consisted of the testimony of the two alleged victims. Notably, following their testimony, DP's charges of obstruction were dropped, and LP was reunited with her parents. Neither apparently has anything to

---

[1] LP refers to Petitioner's granddaughter and she is the purported victim in Count 3. DP refers to Petitioner's daughter as she is the purported victim in Count 6.

gain by recanting, which lends even further credibility to their statements. For these reasons, the Court should conclude that Petitioner has satisfied his burden on both Count 3 and Count 6 of establishing that no reasonable juror would have voted to convict on either count had it been aware of DP and LP's recanting of their trial testimony.

## Judge Rosenblatt's Order

On June 29, 2015, Judge Rosenblatt issued an order stating that the Court had lost confidence in the Petitioner's convictions on Counts 3 and 6 as a result of notarized letters that had been submitted to the Court by alleged victims LP and DP. [Doc. 28 at 12-13; 17-18; Doc. 15-5 at 76-77; 79] Judge Rosenblatt noted the extremely limited evidence at trial as to each count and concluded "it is unlikely that any reasonable juror would have convicted Copeland" of Counts 3 and 6, if the juror found the recantation to be credible. Based upon the Court's concerns about the integrity of Counts 3 and 6, it ordered an evidentiary hearing.

## Legal Standard

The Court is considering Mr. Copeland's claims of actual innocence on Counts 3 and 6 for the purpose of evaluating whether "petitioner should be allowed to pass through the gateway, and argue the merits of the underlying claim" of ineffective assistance of counsel. *Schlup v. Delo*, 513 U.S. 298, 316 (1995). The standard for this evaluation is whether "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id*. at 327. That standard requires the Petitioner to show more than actual prejudice, but less than clear and convincing evidence. *Id.* Each count is evaluated separately.

"In assessing the adequacy of petitioner's showing . . . the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on 'actual innocence' allows the [court] to consider the probative force of relevant evidence that was . . . unavailable at trial. . . . The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that . . . claimed to have . . . become available only after the trial." *Id.* at 328-29 (internal quotes

omitted); *House v. Bell*, 547 U.S. 518, 538 (2006) ("the habeas court must consider all the evidence . . . without regard to whether it would necessarily be admitted under 'rule of admissibility that would govern at trial.'") (citing *Schlup*, 513 U.S. at 327-28 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L.Rev. 142, 160 (1970)).

**Background**

Mr. Copeland was indicted on February 11, 2002, on ten counts, all involving allegations of sexual misconduct involving family members. He was acquitted at trial on one count of furnishing obscene or harmful items to minors, but convicted of the remaining nine counts and sentenced to a total term of 118 years of imprisonment.

Mr. Copeland appealed his conviction through the Arizona state courts without obtaining any relief. He filed two petitions for post-conviction relief in the Arizona state courts, with the second being dismissed as untimely and successive on February 10, 2011. He then filed a petition for review with the Arizona Supreme Court on April 11, 2011, which was summarily denied on January 4, 2013.

Mr. Copeland commenced this habeas action by filing a petition pursuant to 28 U.S.C. § 2254 on November 7, 2013. [Doc. 1] The petition urged numerous grounds for relief. Mr. Copeland's petition was referred to a Magistrate Judge, who recommended that Mr. Copeland's petition be dismissed with prejudice. [Doc. 21] Judge Rosenblatt accepted and adopted in part and rejected in part the Report and Recommendation, ordering that Mr. Copeland's claims of actual innocence relating to Counts 3 and 6 should be considered by the Court. [Doc. 28] Judge Rosenblatt thereafter withdrew the referral to the Magistrate Judge. [Doc. 52]

Judge Rosenblatt authorized the out-of-state depositions of the recanting victims, LP and DP, and ordered the State to pay all costs associated with the depositions.[2] The State appealed that order to the Ninth Circuit, which reversed the order. Following the Ninth Circuit's mandate, the matter was reassigned to Judge Tuchi who authorized the

---

[2] DP has since relocated to Arizona.

taking of the depositions of LP and DP, ordering that all costs associated with the depositions be paid by the U.S. Department of Justice. [Doc. 130] The parties took LP's videotaped deposition, but despite diligent efforts, were unable to secure DP's sworn testimony.[3]

**Argument**

1. Count 3

Count 3 alleges that Mr. Copeland engaged in sexual conduct with his minor granddaughter, LP, between February 1, 2001, and August 24, 2001.  LP was 8 years old at the time of the relevant events.  The evidence with respect to LP at trial was, according to Judge Rosenblatt, "more limited." [Doc. 28 at 17]  Although LP testified at trial that Mr. Copeland touched her on her genitals, she explained that she was sleeping at the time it supposedly occurred and that she only knows it occurred because another family member, Tracy Beauchamp, told her that it had happened.  LP had no independent memory of the event.[4]  [Doc. 15-2 at 137-138]  She was then asked, "[o]ther than that day, was there any other time that Alfred touched you on your private?" [*Id*.]  She answered unequivocally, "No." [*Id*.]  LP was asked numerous additional questions on direct examination relating to whether Mr. Copeland had touched her inappropriately to which she responded generally that she did not know or did not remember.

Tracy Beauchamp testified as well and was asked whether she observed Mr. Copeland inappropriately touch LP.  Tracy testified that she recalled LP sleeping on the couch next to Mr. Copeland, that Mr. Copeland "was rubbing her legs, her arms, her head

---

[3] The videotaped deposition and transcript are being lodged under seal with the Court (on a disc and in hard copy, respectively), so as to preserve the privacy of LP.  Counsel for the State has a copy of the transcript in both forms as well.  Petitioner filed a motion requesting that a transcribed, but unsworn interview of DP in which both counsel for Petitioner and counsel for the State participated be admitted as DP's testimony [Doc. 134], but the Court denied the motion.  [Doc. 139]

[4] LP had also participated in a forensic interview in which she claimed that Mr. Copeland had touched her genitals while sleeping. [Doc. 15-2 at 177]

-4-

occasionally." [Doc. 15-4 at 10-11] She was specifically asked, "Did he touch her - - did you see him touch her on the breasts or genital area?" She answered "No, I didn't." [*Id.*]

Kenneth Copeland, LP's brother, also testified. He was asked, "Have you ever seen your grandfather do something to [LP]?" He responded, "I haven't seen him, all I've really seen him do is rub on her while she is sleeping." [Doc. 15-2 at 94] On further examination, he stated that he saw Mr. Copeland fondle LP's breasts over her clothes and that he saw Mr. Copeland's "hands between her legs and between her thighs and over her genitals, over her clothes." [Doc. 15-2 at 98]

Finally, there was testimony from Catherine Coffman, a pediatrician who had examined LP. She testified that LP's "hymenal exam was abnormal." She did not see any acute trauma, but she did see "very little hymenal tissue." [Doc. 15-3 at 12] While Dr. Coffman could not say for certain what caused the absence of hymenal tissue in LP, she believed, based upon her experience, that it was the result of some sort of trauma, arising out of penetration into the vaginal canal. [Doc. 15-3 at 16] Notably, Dr. Coffman was asked whether the injury to LP's hymen was "consistent with the history of abuse that was provided to you through the detective or through the worker who brought [LP] in?" She answered affirmatively, but noted, "And my understanding is that the allegations were of fondling. Ordinarily I don't expect to see any abnormalities with fondling, but certainly there can be associated abnormalities." [Doc. 15-3 at 19]

In 2009, LP, who was 9 years old at the time of the events alleged in the indictment, executed a notarized statement stating:

> In 2002, my grandfather, Alfred Copeland was accused of having sexual intercourse with me. **That never happened**. I am still virgin. The D.A. based this accusation on the fact that my hymen is missing. This was caused by a severe yeast infection. I scratched myself until I was bleeding. My mother took me to an emergency clinic in Aug 2001 for treatment. During the course of all these things I was taken away from my family. I was alone and scared and didn't know what to do. Now I want to correct this injustice of a lifetime sentence on my grandfather, for something that did not happen.

[Doc. 15-5 at 79 (emphasis added)]

Her statement directly rebuts the evidence at trial regarding the condition of her hymen, which the State's expert testified was likely the result of the abuse alleged in the indictment.[5] LP explains in her notarized statement that she had had a severe yeast infection and that she scratched herself to the point where she required treatment at an emergency clinic; she contends that this incident, rather than abuse, is the explanation for the condition of her hymen when she was examined in 2001.

LP was deposed on September 13, 2019, by counsel for Petitioner and counsel for the State. LP was placed under oath and advised that her testimony would be used at the hearing in this matter and that she had an obligation to tell the truth. [TR of Deposition of LP at 6] LP was asked about an incident in which she was supposedly sleeping on a loveseat next to Mr. Copeland. She first testified she had no recollection of any such incident, but recalled the loveseat. [TR of Deposition of LP at 8-10] She did recall waking up on the loveseat and other family members looking at her and her brother Kenneth telling her that Mr. Copeland had been touching her. LP dismissed Kenneth's description because she was a light sleeper and would remember that if it had occurred. [TR of Deposition of LP at 24]

At her deposition, LP testified unequivocally that (i) Mr. Copeland never touched her in her "private places," (ii) that it is not possible he did and she just does not remember, and (iii) that it would be something she would in fact remember. [TR of Deposition of LP at 16] She further testified that her testimony where she answered yes to the question, "Has Alfred ever touched you on your private part between your legs?" was not true. [TR of Deposition of LP at 17]

LP explained the context of her trial testimony and the significant domestic upheaval she was experiencing at the time. LP had been taken away from her parents and she was living with relatives. She testified that the prosecutor told her just before her trial testimony, "I'm going to ask you if Alfred ever touched you on your private parts . . .

---

[5] Petitioner filed a motion requesting the appointment of an expert. [Doc. 128] The Court has not yet ruled on that motion.

And whenever I ask you that question, I want to you to say yes. . . She said that was the only way I was going to go home." [TR of Deposition of LP at 19] LP elaborated that the prosecutor had told her "that [Petitioner] needed to go away because he was a bad man who had done this before, and that I was supposed to say yes because that was the only way I was going to be able to go home. I asked her if I could see my dad or my mom and she said, 'You can't see your mom right now.'" [TR of Deposition of LP at 20]

LP testified that she has not seen Mr. Copeland since the trial in 2002, that she has received Christmas cards from him, and that she has written a few letters to him over the years, but that she does not recall speaking to him since the trial. [TR of Deposition of LP at 38-39]

LP also recalled being examined when she was 8 or 9 and being told that her hymen was missing. She did not know what that meant at the time. She further recalled having "yeast infections from the time I was born and up until I was about 13 years old." [TR of Deposition of LP at 34] She remembered scratching herself until bleeding and going to an emergency clinic with her mother in August of 2001. [TR of Deposition of LP at 34-36]

LP was shown the following documents during her deposition:

- <u>A signed and notarized statement dated June 5, 2009</u>, in which LP recants her trial testimony, denies having sexual intercourse with Petitioner, and explains that her hymen is missing as a result of a severe yeast infection. She states that she testified as she did because she was alone and scared and have been taken away from her family. [Dep. Exh 3, Doc. 15-5 at 79]

- <u>A signed and notarized statement dated June 19, 2009</u>, affirming that her June 5, 2009 statement was made voluntarily and was not the product of threats or bribes, and that she had not seen Mr. Copeland since the trial in 2002. [Dep. Exh 4]

- <u>An affidavit dated August 28, 2015</u>, stating that the allegations concerning her laying on the loveseat next to her grandfather were untrue and that she had been coached to say what she had said at trial. [Dep. Exh. 5]

- <u>A March 18, 2015 letter to Magistrate Judge Metcalf</u> stating that Mr. Copeland had never touched her inappropriately. [Dep. Exh. 6]

1    With respect to all these exhibits, LP testified that while she did not write them, she read
2    them carefully before signing, that she signed them voluntarily, that they were all
3    accurate and that the signature was hers.
4        The evidence supporting a conviction of Mr. Copeland on Count 3 amounted to
5    the statements LP made to the forensic examiner, which were inconsistent with her trial
6    testimony, the testimony of her brother Kenneth that he had observed Petitioner "rubbing
7    on her," and the testimony of Dr. Coffman, which focused on LP's hymenal exam, even
8    though the testimony at trial on Count 3 related to touching and fondling over the clothes,
9    not penetration.  When that is balanced against LP's unequivocal and emphatic denial
10   that Petitioner had ever touched her inappropriately, that she had suffered from yeast
11   infections, that she had been removed from the home (which is not disputed) and wanted
12   to please the prosecutor so she could go home to her parents, the conclusion must be that
13   Petitioner has met his burden on actual innocence and should be permitted to pursue his
14   ineffective assistance claim.  That conclusion is further buttressed by LP's testimony that
15   she has not seen Petitioner since the trial, does not recall talking to him, has not been
16   offered anything in return for her testimony and has had nothing more than a sporadic
17   exchange of Christmas cards and letters over the many years of his incarceration.  She
18   has no motivation to fabricate her testimony.  In fact, if her original testimony were true,
19   she would have every incentive to refuse to testify or submit documents on Petitioner's
20   behalf since he is incarcerated and has no apparent ability to retaliate against her if she
21   were to refuse to assist him.

   2.  Count 6

23   Count 6 alleges that Copeland engaged in incest with his adult daughter, DP (LP's
24   mother) "on or between the 1st day of January 2001 and the 24th day of August, 2001."
25   [Doc. 1 at 18-19] As Judge Rosenblatt pointed out in his order, while there was extensive
26   evidence at trial of acts of incest with DP, Judge Rosenblatt observed that "[t]he only
27   evidence regarding incest during that particular time came from DP."  [Doc. 28 at 12]  In
28   2009, DP executed a notarized statement recanting her trial testimony:

> My father Alfred Copeland was charged with and convicted of incest with me. **That charge is false**. When I refused to accuse my father, the detective called me a liar. That is contained in the PPD report. After that I was arrested on a Class 6 Felony for Failure to Protect and Hampering an Investigation. My daughter was taken from me and placed with AZ CPS. I was held in the Maricopa County Jail for 3 months. The D.A. in the case Jeanine Sorrentino told me that if I didn't say what they wanted me to, she would see to it that I got 25 year[s] in ASPC. Not knowing any better I gave in.

[Doc. 15-5 at 76-77 (emphasis added)]

The essence of DP's recantation is that she testified as she did at trial because she was threatened with prosecution for obstruction and the loss of her child if she did not testify that Petitioner had engaged in the conduct for which he was charged in Count 6.

Critically, many of the facts in DP's notarized statement, which led Judge Rosenblatt to lose confidence in Petitioner's conviction on Count 6, are demonstrably true and support her claim that her trial testimony was fabricated. In particular: (i) her daughter LP was taken from her and placed with Child Protective Services and then with family members [Doc. 15-3 at 160]; (ii) she was charged with obstructing a criminal investigation [*State of Arizona v. DP*, CR2001-013402-A; Doc. 15-3 at 126]; (iii) DP testified against Petitioner at a hearing on August 8, 2012, reversing what she had initially told the police about the allegations [Doc. 15-3 at 138-39]; and (iv) DP testified against Petitioner at trial, [Doc. 15-3 at 123]. Petitioner was convicted on September 25, 2002, and on September 30, 2002, the State moved to dismiss the charges against her and thereafter LP was returned to her. [*State of Arizona v. DP*; CR2001-013402-A]

The Court granted Petitioner's request to depose DP, rather than call her as a live witness. [Doc. 130] Petitioner's counsel sought permission to depose DP because Petitioner's counsel had tried repeatedly without success to meet with DP and to arrange for her testimony at an evidentiary hearing, and because DP's living situation appeared unstable. DP's videotaped deposition was set and confirmed for September 18, 2019. On the morning of the scheduled deposition, however, DP asked Petitioner's counsel's assistant by phone if counsel could arrange for a car to transport her to the deposition.

1    DP stated that without such arrangements, she would not be able to attend because she
2    did not have the money for transportation.  Petitioner's counsel and his assistant
3    explained to DP that they would not be able to arrange for transportation and, based on
4    Court deadlines, it was unlikely that they could reset her deposition.  DP did not appear
5    for the scheduled deposition.  Because DP does not have an address, Petitioner's counsel
6    was not able to serve her with a subpoena for the hearing.
7    　　　　While DP's sworn testimony following her recantation was not obtained, that
8    alone should not determine the outcome of Petitioner's claim of actual innocence on
9    Count 6.  The Court has and should consider the notarized communications provided by
10   DP along with the evidence presented at trial.
11   　　　　Even without DP's sworn testimony, the Court should conclude that Petitioner met
12   his burden of proving that no reasonable juror would convict with the new evidence.  *See*
13   *Schlup*, 513 U.S. at 327-28.  As Judge Rosenblatt observed, the only evidence against
14   Petitioner on Count 6 was the very limited testimony of DP.  The testimony on that Count
15   was not detailed at all and no other witness, no physical evidence, nor any document
16   corroborated it.  Moreover, it is undeniably true that DP had herself been charged with a
17   crime (obstruction) following Petitioner's arrest, her young daughter had been taken out
18   of the home, and once DP changed her story, the obstruction charges against her were
19   dropped and her daughter was returned to her.  Getting the charges against her dismissed
20   and her daughter returned were powerful motivations for her to testify in a manner that
21   supported the State's case.  Like LP, there would be no obvious reason for DP to recant
22   her trial testimony now if it were true.  Petitioner is in custody, is elderly, is indigent and
23   does not appear to be in any position to do anything for DP in return for her recantation.
24   Conversely, the statute of limitations on the obstruction charge has passed and LP is now
25   an adult, so DP has no reason to fear the same sort of adverse consequences that
26   previously resulted for taking a position inconsistent with the State.
27   　　　　The Court should not hold DP's failure to attend her deposition against Petitioner.
28   DP maintained phone contact with counsel for Petitioner, submitted to a detailed

interview by both Petitioner's counsel and counsel for the State, and called Petitioner's counsel's office on the day of the deposition in the hopes of securing transportation. She has no resources – that is not her fault or Petitioner's fault. Her denial of the allegations were without reservations and when compared to the very thin evidence of guilt and the other real pressures on DP to testify against Petitioner, the Court should find that Petitioner has met his burden on Count 6 as well and allow the ineffective assistance claim to proceed.

**Relief Requested**

For the reasons described above, the Court should conclude that Petitioner satisfied his burden on his claims of actual innocence on Counts 3 and 6 and allow him to proceed with his claims of ineffective assistance of counsel on those two counts.

RESPECTFULLY SUBMITTED on February 14, 2020.

MITCHELL | STEIN | CAREY | CHAPMAN, PC

By: *s:/ Lee Stein*
Lee Stein
Attorneys for Petitioner

//
//
//
//
//
//
//
//
//
//
//

-11-

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2020, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and copy of the transmittal to the following ECF registrant:

Erin Davies Bennett
Gracynthia Claw
Assistant Attorney Generals
Arizona Attorney General's Office
Criminal Appeals Section
2005 N. Central Ave.
Phoenix, AZ 85004

Attorneys for Respondents

   *s:/ B. Wolcott*