MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

GRACYNTHIA CLAW
STATE BAR NUMBER 030265
ERIN BENNETT
STATE BAR NUMBER 027078
ASSISTANT ATTORNEYS GENERAL
CRIMINAL APPEALS SECTION
2005 N. CENTRAL AVENUE
PHOENIX, ARIZONA 85004-1580
TELEPHONE: (602) 542-4686
CADocket@azag.gov

ATTORNEYS FOR RESPONDENTS

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Alfred Copeland,<br><br>                    Petitioner,<br><br>          -vs-<br><br>David Shinn, et al.,<br><br>                    Respondents. | CV 13–02278–PHX–JJT<br><br>**SUPPLEMENTAL BRIEF RE: PETITIONER'S FAILURE TO PROVE ACTUAL INNOCENCE UNDER *SCHLUP V. DELO*** |

Respondents (the "State") file this supplemental brief pursuant to the Court's June 24, 2019 and January 23, 2020 orders, which ordered the parties to submit simultaneous briefs addressing whether Copeland has met the demanding standard of proving actual innocence for Counts 3 and 6 of the indictment, according to *Schlup v. Delo*, 513 U.S. 298 (1995). (*See* Dkt. #119, 143.) Counts 3 and 6 of the indictment correspond, respectively, to Grounds 2 and 1 of Copeland's habeas petition, which allege ineffective assistance of trial counsel in connection with those trial counts ("IAC claims"). (Dkt. #28, at 10, 13; #1, at 6–7.)

Despite having had the opportunity to do so, Copeland fails to satisfy his burden of proving actual innocence. Therefore, the habeas petition and its

outstanding IAC claims must be dismissed as a matter of law, as explained in the following Memorandum of Points and Authorities.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   RELEVANT FACTUAL AND PROCEDURAL HISTORY.

### A.   *Trial*.

In 2002, a jury convicted Copeland of several sexual misconduct counts, including sexual misconduct with a minor for penetrating the genitals of his eight-year-old granddaughter, LP, between February 1 and August 24, 2001 (Count 3), and incest with his adult daughter, DP, sometime between January and August 2001 (Count 6).   (Dkt. #15–5, at 4–5; #28, at 10, 14.)   LP and DP testified at Copeland's trial, as did Copeland's other daughter ("Tracy"), his stepdaughters ("Carla" and "Cathy"), one of his sons ("Ernest"), and his grandson ("KC").   (Dkt. #15–2, at 52–53, 86–87, 127–28; #15–3, at 25–26, 66–67, 97, 147–48.)   Other witnesses included child forensic interviewer Wendy Dutton, pediatrician Dr. Catherine Coffman, and Phoenix Police Detective Jerry Barker.   (Dkt. #15–2, at 23; Dkt. #15–5, at 7–8.)

### 1.   Trial evidence proving Count 3.[2]

Dutton interviewed LP on August 30, 2001 and March 15, 2002 about Copeland's inappropriate sexual touching.   (Dkt. #15–2, at 174–75.)   In the second interview, LP recounted at least two specific incidents when Copeland had touched her and, on one of those occasions, had pinched her under her clothes, in her groin area, in a manner that had hurt her.   (Dkt. #15–5, at 7–8.)   A video-recording of that

---

[1] If the Court disagrees with the State's position as to whether Copeland has met his burden or not, the State respectfully requests an opportunity to address the IAC claims' merits.

[2] Count 3 concerned Copeland's penetration of LP's vagina.   It did *not* relate to the breast and genital fondling that occurred in the living room, while LP was on the loveseat with Copeland; that incident gave rise to trial counts 1 (sexual abuse) and 2 (molestation).   (*See* Dkt. #64, at 3; #60–2, at 2–3; #15–4, at 100–02.)

1   interview was played for the jury.  (Dkt. #15–2, at 176–77; Dkt. #112.)

2       Dr. Coffman physically examined LP within six months of the last known

3   incident of sexual abuse.  (Dkt. #15–3, at 7.)  She did not see any bruises,

4   abrasions, or redness but saw that LP's hymen was abnormal.  (*Id.* at 13.)  The

5   hymenal tissue was missing in some areas and narrowed in others, indicating

6   something had repeatedly penetrated LP's vaginal canal in a manner consistent

7   with sexual abuse and would have been painful for LP.  (*Id.* at 13–17, 20.)

8       Based on her medical expertise and experience, Dr. Coffman rejected the

9   possibility that the trauma to LP's hymen was accidental, due to perhaps

10  masturbation or a common "straddle injury."  (*Id.* at 7, 17–19; *see also* Dkt. #15–5,

11  at 8.)  She explained that if an accident causes injury to a child's hymen, the child

12  would be "bleeding so badly" and would "usually need surgical repair"—Dr.

13  Coffman did not see any external scar tissue or sutures to suggest LP had suffered a

14  significant accidental injury of that nature.  (Dkt. #15–3, at 18–19.)  In addition,

15  DP (LP's mother) confirmed that she had never taken LP to see a doctor for any

16  sort of genital trauma or problem; she had no recollection of LP ever falling and

17  injuring her genital area; and, while she recalled LP "once" having something like

18  a rash, the rash did not require medical treatment—DP treated it using only baby

19  powder.  (*Id.* at 97, 130.)

20      LP, then nine years old, testified she was scared of Copeland and believed he

21  would hurt her.  (Dkt. #15–2, at 127, 134, 143.)  She first testified that she did not

22  know why she was afraid of him, but eventually admitted it was because he had

23  touched her "private part between [her] legs."  (*Id.* at 134–35, 137.)  When asked if

24  "anything ever happen[ed] to the inside of [her] private [part]," LP testified she did

25  not remember and did not remember if Copeland had "ever put anything in [her]

26  private."  (*Id.* at 140, 147.)  She also did not remember if her "private parts" were

27  ever "hurt."  (*Id.* at 155.)  Nor did she remember talking to Detective Barker or a

28  red-haired lady (presumably Dutton) about Copeland's inappropriate sexual

1 touching.  (*Id.* at 140–41.)  Dutton testified that a child's lack of memory could be
2 due to the child dissociating herself from a traumatic event as a coping mechanism.
3 (*Id.* at 170–71.)

4 **2.**      **Other trial evidence regarding LP's abnormal hymen.**

5 In cross-examining DP, Copeland's counsel established that DP did not
6 recall anyone, including anyone from the State, asking her for LP's medical records
7 and prior doctors' names.  (Dkt. #15–3, at 132.)  Trial counsel also cross-examined
8 LP about any injuries she had in the previous two years, establishing LP could not
9 remember all her injuries, could not recall her private parts being hurt, and did not
10 always tell her parents about her injuries.  (Dkt. #15–2, at 154–55.)

11 Trial counsel cross-examined Dr. Coffman about LP's hymenal injury
12 possibly being accidental since Dr. Coffman did not know LP's prior medical
13 history and did not request to see her medical records.  (Dkt. #15–3, at 20–24.)  Dr.
14 Coffman acknowledged it was possible, though not likely, that a "freak accident"
15 could cause abnormalities to a child's hymen, similar to what LP had exhibited, but
16 that child would have to "fall in a straddle position and be impaled" on an object in
17 order for that to be the case.  (*Id.* at 17–18.)

18 **3.**      **Trial evidence regarding LP's temporary home removal.**

19 LP was removed from DP's home in August 2001; stayed with her aunts and
20 uncles for approximately a month to a month and a half thereafter; and then briefly
21 returned to her father but was removed and placed with her aunts and uncles again
22 in October 2001.  (Dkt. #15–2, at 69, 129–30; Dkt. #15–3, at 139.)  LP moved back
23 in with DP and her dad sometime shortly before trial and was still living with them
24 on the day LP testified at trial—the latter fact was established through DP, LP, and
25 Ernest's testimonies.  (Dkt. #15–2, at 71, 149; Dkt. #15–3, at 139.)  LP told the
26 jury she was sad when she was living apart from her parents and knew it had
27 something to do with Copeland.  (Dkt. #15–2, at 148–49.)  While she was
28 separated from her parents, all she really wanted was to live with them again and

was happy when she did return home.  (*Id.* at 148–49, 156–57.)

DP agreed on cross-examination that the State had "assist[ed] in bringing [LP] home," which made DP "feel better."  (Dkt. #15–3, at 135.)  She testified:

> Q.    … [LP] recently c[a]me home to live with you again, hasn't she?
>
> A.    Yes.
>
> . . . .
>
> Q.    And ever since she's been out of the house, you've wanted her to come back?
>
> A.    Yes.
>
> Q.    Have you asked me, through your attorney, on numerous occasions to let your daughter come back?
>
> A.    Yes.
>
> . . . .
>
> Q.    What is a guardian at litum, to your understanding?
>
> A.    Protects the rights of my daughter.
>
> Q.    Is he in charge of where your daughter lives at this point in time?
>
> A.    Yes.
>
> . . . .
>
> Q.    Was it [LP's guardian at litum's] decision to send [LP] home to you?
>
> A.    Yes.
>
> Q.    To your knowledge, did I have anything to do with that?
>
> A.    No.
>
> Q.    Finally, do you know who appointed [the guardian ad litum]?
>
> A.    The State of Arizona.

(*Id.* at 139–41.)

**4.    Trial evidence relating to LP's inculpatory statements.**

Copeland's counsel cross-examined Dutton about her forensic interviews of

1   LP.  Dutton agreed that a child's lack of memory might not always be a form of
2   dissociation and, instead, could be due to the child's lying about the event having
3   ever occurred, and Dutton had no forensic means of determining which might be
4   the cause in any given matter.  (Dkt. #15–2, at 183–84.)  Dutton admitted that LP
5   had told her that she thought she had to go to the forensic interviews, but Dutton
6   had no personal knowledge about who may have told LP she had to go to the
7   interviews.  (*Id.* at 181–82.)

8       Dutton agreed that discussing the same material more than once, using
9   suggestive or leading questions, can change a child's memory and, in turn, could
10  taint the forensic interview on the same topic.  (*Id.* at 175, 182–85.)  Dutton knew
11  LP had spoken to her aunt about the sexual misconduct, but she did not know for
12  how long or how many times.  (*Id.* at 182–83.)  LP also had been questioned
13  several times by law enforcement about Copeland touching her; however, LP
14  testified that no one had told her what to say either to the police or in court about
15  Copeland.  (*Id.* at 150–51, 156–57.)

16              **5.    DP's trial testimony.**

17       DP had lived with Copeland for nearly her entire life, including as an adult.
18  (Dkt. #15–3, at 96, 107.)  They first had sex when DP was 13 years old and
19  continued to have sex any time Copeland wanted.  (*Id.* at 116–17.)  The last time
20  they had sex was in the summer of 2001, about a month before Copeland was
21  arrested.  (*Id.* at 122.)  Copeland made DP believe that their sexual relationship was
22  her fault because of something she supposedly had done to him when she was five
23  years old.  (*Id.* at 115.)  Copeland was "controlling and manipulative." (*Id.* at 108.)
24  Copeland once tried to get DP to have sex with Ernest when DP was a child.  (*Id.*
25  at 113.) He mentally and physically intimidated DP; made her feel inferior and
26  incapable of doing anything without him; and sometimes beat her when she
27  refused to have sex with him.  (*Id.* at 108–09, 115–16.)  DP feared him.  (*Id.*
28  at 115.)

6

DP was embarrassed about her sexual relationship with Copeland—she "felt dirty"—and that was why she remained silent for so long. (*Id.* at 123, 125.)  She once tried to have Copeland held accountable for his misconduct and had reported him to Tucson law enforcement for sexually molesting her and her stepsister, but she eventually recanted after speaking to her mother and grandmother—her grandmother told her that she "needed to stop lying so [she] could go home, because if [she] didn't, [she'd] never get to go home and [she] would never see [her] mom and [her] brothers again." (*Id.* at 118, 120–21.)

DP admitted she was being prosecuted in Arizona for obstructing justice because she had "urged" KC to lie about seeing Copeland touching LP. (*Id.* at 126, 145.)  The prosecutor did not discuss the obstruction charge with her, even though she had asked about it; she and the prosecutor have never talked outside the presence of DP's attorney, who was also present during DP's trial testimony; and the prosecutor did not make her any promises regarding that charge in exchange for her trial testimony. (*Id.* at 126–27.)  DP testified on cross-examination:

> Q.    Didn't you state on direct examination that you agreed with [the prosecutor] that you approached the State, at least through your attorney, a couple of times, about trying to resolve this [obstruction charge]?
>
> A.    I have a couple of times.
>
> Q.    But they wanted you to come in to testify; is that correct?
>
> A.    Yes.
>
> Q.    And did you come in also with the expectation that your testimony will somehow help, in terms of your pending case?
>
> A.    No.

(*Id.* at 137.)  On redirect, DP clarified that, before she was even arrested and charged with obstruction, she had already made statements against her interest during a police interview that she had requested. (*See id.* at 138–39.)

**B.**     ***Habeas proceedings.***

Copeland filed his habeas petition on November 7, 2013, asserting seven grounds, most of which asserted multiple sub-claims.  (Dkt. #28, at 1, 6–12.)  This Court concluded the petition was untimely by more than eight years under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and Copeland's post-conviction relief proceedings in state court did not statutorily toll the applicable limitations period.  (*Id.*; Dkt. #21, at 5–6.)   The Court further concluded, because Copeland had failed to establish that he had pursued his rights diligently, he was also not entitled to equitable tolling under the theory that an extraordinary circumstance caused the habeas petition's untimely filing.  (*See* Dkt. #28, at 2–3.)  The Court did not address whether Copeland is entitled to equitable tolling under a miscarriage-of-justice theory for actual innocence of Counts 3 and 6.  (*See id.* at 2–3, 13, 18.)

Of the various sub-claims Copeland asserted in his habeas petition, the Court dismissed all but two of them: the IAC claims relating to Counts 3 and 6.  (*Id.* at 19; *see also* Dkt. #106.)  Copeland did not timely assert either of those claims in state court as part of his post-conviction relief proceedings.  (Dkt. # 15–5, at 28–29, 47–48, 149–50, 166.)

The IAC claims alleged Copeland's trial counsel was ineffective for failing to obtain and present exculpatory evidence for Counts 3 and 6 that supposedly had been available at the time of trial and would have established the following: (1) LP denied any inappropriate touching by Copeland and only made inculpatory statements because she had been "taken away from [her] family" and "was alone and scared and didn't know what to do"; (2) a severe yeast infection, not sexual misconduct, was the "likely" cause of LP's abnormal hymen; (3) LP "was treated in August 2001 for a severe yeast infection," which caused LP to scratch herself and bleed; (4) the incest charge involving DP was false; and (5) law enforcement coerced DP to testify against Copeland at trial.  (*See* Dkt. #1, at 6–7, 28; Dkt. #1–1,

at 3, 14; *see* Dkt. #28, at 10, 13.)  Copeland attached to his habeas petition letters signed by DP and LP in 2009 that contained statements to that effect.  (Dkt. #1, at 28; #1–1, at 3.)

The Court discussed the potential impact of the 2009 letters and concluded, *if* their contents were true, they would "cause[] the Court to lose confidence" in Copeland's convictions for Counts 3 and 6.  (Dkt. #28, at 12–13, 17–18.)  For that reason, the Court did not dismiss the IAC claims but instead granted Copeland an evidentiary hearing to provide him "the opportunity to present evidence regarding his actual innocence" for those specific counts, "for the purpose of seeking to excuse his procedural default and overcome the statute of limitations bar" on the IAC claims.  (*Id.* at 13, 18.)  The Court later added: "[T]he credibility and reliability of DP's and LP's recantations are questions of fact that will be determined after the evidentiary hearing, as will the determination of whether those recantations are sufficient to support a showing of actual innocence."  (Dkt. #32.)

In a subsequent joint filing, the parties (1) agreed they could stipulate to the substance of their anticipated evidentiary-hearing witnesses and the admission of exhibits, thereby eliminating the need for live witness testimony, and (2) could litigate the actual innocence matter through briefing based on their stipulation. (Dkt. # 61.)  The Court ordered the parties to "submit as exhibits the videos" of LP and DP's depositions so the Court could "review and consider[]" them "in determining [Copeland's] claims of actual innocence on [C]ounts 3 and 6."  (Dkt. #66.)

After subsequent arguments regarding whether the Court could resolve the IAC claims on their merits without an evidentiary hearing (*see* Dkt. #107, #118–19), the Court re-affirmed the need for an evidentiary hearing, finding it "untenable" to decide the merits without first holding an evidentiary hearing  (Dkt. #119).  It explained it must "determin[e] the credibility and reliability of DP and LP's recantation statements," *before* it would be able to determine whether

1  Copeland's trial counsel had provided ineffective assistance of counsel.  (*Id.* at 2.)
2  The Court additionally believed LP's and DP's testimonies at an evidentiary
3  hearing, whether presented as live testimony or videotaped deposition, might also
4  be helpful in making a merits' determination because the Court would be able to
5  evaluate the "content" and "contours" of the written statements while LP and DP
6  are under oath.  (*Id.*)

7      The State and Copeland subsequently underwent discovery and filed their
8  disclosure notices on September 6, 2019.  (Dkt. #132–33.)  The parties deposed LP
9  on September 13, 2019; her deposition was videotaped and transcribed.  Copeland
10  indicated he will be submitting the video and transcript of that deposition for the
11  Court's consideration.  (*See* Dkt. #142.)

12      DP's deposition was scheduled for September 18, 2019.  (*Id.*)  DP informed
13  Copeland's counsel that morning, however, that she was not going to appear and,
14  in fact, did not appear for her deposition.  (*Id.* at 2.)  Copeland's counsel later
15  expressed, given DP's "history" of "failing to appear as promised," "securing [her]
16  testimony either by deposition or at a hearing will not be possible."  (*Id.*)
17  Copeland then moved to admit unsworn telephonic statements (audio-recorded and
18  transcribed) from 2015, purportedly made by DP, as a substitute for DP's
19  deposition and live testimony.  (*See id.* at 2–3.)  The Court denied the motion after
20  finding the telephonic statements lacked the guarantees of trustworthiness for
21  admission under federal evidentiary rules.  (Dkt. # 139.)

22      The parties' final discovery deadline expired on September 20, 2019.  (Dkt.
23  #119, at 3.)  Undersigned counsel conferred with Copeland's counsel at a
24  November 2019 status hearing, and he confirmed he had no intention of calling or
25  subpoenaing DP as a witness—or any other witness for that matter—to testify at
26  the evidentiary hearing.  (*See* Dkt. #141.)  Given neither party intended to call live
27  witnesses at the evidentiary hearing, the Court vacated the evidentiary hearing at
28  the parties' request and further ordered simultaneous briefing regarding Copeland's

1  actual-innocence gateway claims.  (Dkt. #143.)

2  **II.**   *SCHLUP*'S DEMANDING STANDARD OF PROVING ACTUAL INNOCENCE.

3      "Federal courts retain the authority to issue the writ of habeas corpus in a []
4  narrow class of cases," despite the existence of a procedural bar.  *McCleskey v.*
5  *Zant*, 499 U.S. 467, 494 (1991).   One such class of cases is that which
6  "implicat[es] a fundamental miscarriage of justice": "extraordinary instances when
7  a constitutional violation probably has caused the conviction of one innocent of the
8  crime."  *Id.*   Cases of actual innocence fall within that narrow class of cases.
9  *Schlup*, 513 U.S. at 314–15, 322.

10      "Actual innocence" under *Schlup* "means factual innocence, not mere legal
11  insufficiency."  *Bousley v. United States*, 523 U.S. 614, 623–24 (1998); *see also*
12  *United States v. Ratigan*, 351 F.3d 957, 965 (9th Cir. 2003) (stating petitioner's
13  "procedural default could be excused if he could show actual, factual innocence,
14  not just legal insufficiency of the evidence").   "This rule … is grounded in the
15  'equitable discretion' of habeas courts to see that federal constitutional errors do
16  not result in the incarceration of innocent persons."  *Herrera v. Collins*, 506 U.S.
17  390, 404 (1993).

18      Importantly, if proven, actual innocence only provides a "gateway" to merits
19  review and "does not by itself provide a basis for [habeas] relief"—it is
20  "procedural, rather than substantive."  *Schlup*, 513 U.S. at 314–15; *see also*
21  *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("We hold that actual innocence,
22  if proved, serves as a gateway through which a petitioner may pass whether the
23  impediment is a procedural bar… or… expiration of the statute of limitations.");
24  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (explaining a federal court is
25  barred from reviewing a prisoner's defaulted habeas claims "unless the prisoner
26  can demonstrate … that failure to consider the claims will result in a fundamental
27  miscarriage of justice").

28      Actual-innocence gateway claims come to courts in a unique procedural

posture.  *See Herrera*, 506 U.S. at 399–400.  The petitioner has been previously convicted at trial; *i.e.*, the State has already introduced evidence sufficient for a jury to find the petitioner guilty beyond a reasonable doubt.  *See id.*  "Thus, in the eyes of the law, petitioner does not come before the Court as one who is 'innocent,' but on the contrary, as one who has been convicted by due process of law of [a crime]."  *Id.*

To overcome the presumption of guilt that results from conviction at trial, "a *petitioner* must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 327 (emphasis added); *accord McQuiggin*, 569 U.S. at 399.  That standard is "demanding," *McQuiggin*, 569 U.S. at 400, and will be met only in "extremely rare" cases, *Schlup*, 513 U.S. at 324.  *See also House v. Bell*, 547 U.S. 518, 536–40 (2006) (reaffirming *Schlup*'s miscarriage-of-justice exception and highlighting the standard is "demanding" and will permit review only in "extraordinary" cases).  A petitioner must prove his innocence with "*new [and] reliable evidence*—whether it be exculpatory scientific evidence, *trustworthy* eyewitness accounts, or critical physical evidence—that was not presented at trial."  *Schlup*, 513 U.S. at 324 (emphasis added).

To determine whether the petitioner has met his burden under *Schlup*, a court must employ a two-step standard of review.  The first step is to necessarily determine whether the proffered evidence of actual innocence is new and reliable. *See Doe v. Menefee*, 391 F.3d 147, 172 (2d Cir. 2004) ("Because *Schlup* also requires that any new evidence of actual innocence be reliable, the habeas court must analyze not only whether the new evidence throws the pre-existing evidence into doubt, but whether the new evidence itself may be considered reliable in light of the pre-existing evidence."); *accord Schlup*, 513 U.S. at 328.  Indeed, a court need not go further in its analysis if the petitioner fails to present any new, reliable evidence of his actual innocence.  *See Doe*, 391 F.3d at 172 ("Because Doe has not

1   presented any new reliable evidence, it is unnecessary to determine whether no
2   reasonable juror would convict in light of Doe's newly proffered evidence.").

3          The second step requires the court to supplement the trial evidence with any
4   new, reliable evidence, and then "make a probabilistic determination about what
5   reasonable, properly instructed jurors would do" if they had deliberated guilt and
6   innocence based on the newly supplemented record.  *Schlup*, 513 U.S. at 329; *see*
7   *also House*, 547 U.S. at 538 ("Because a *Schlup* claim involves evidence the trial
8   jury did not have before it, the inquiry requires the federal court to assess how
9   reasonable jurors would react to the overall, newly supplemented record.").  The
10  petitioner has satisfied *Schlup* only if, at the conclusion of the second step, the
11  court concludes "no reasonable juror would have found the [petitioner] guilty"
12  based on the newly supplemented record.  *Schlup*, 513 U.S. at 329; *accord Lee v.*
13  *Lampert*, 653 F.3d 929, 938 (9th Cir. 2011).

14  **III.   ALLEGED EVIDENCE OF ACTUAL INNOCENCE.**[3]

15         **A.   *2009 unsworn statements (3 total).***

16         Attached to Copeland's habeas petition were three letters signed by LP and
17  DP.  (Dkt. #1, at 28; #1–1, at 3–4.)  The letters were notarized, but their statements
18  were not made under penalty of perjury.  (*See id.*)

19         The **first letter**, which Copeland wrote and LP signed on June 5, 2009,
20  contains the following statements (Dkt. #1–1, at 3; R.T. 9/13/19, at 27):

21     • Count 3 "never happened."

22     • LP's "missing" hymen "was caused by a severe yeast infection,"
23        and she had "scratched [herself] until [she] was bleeding."

24     • "[DP] took [LP] to an emergency clinic in August 2001 for
        treatment" of the yeast infection.
25

26  ─────────────────────
27  [3] Given the State was ordered to file a simultaneous brief, it lacks knowledge of the
    evidence on which Copeland's actual-innocence argument for Counts 3 and 6 will
    rely.  To the extent Copeland relies on anything not listed in this section, the State
28  reserves the right to supplement its brief to address that particular argument.

- At the time of trial, LP was "alone and scared and didn't know what to do."

This letter was written when LP had just turned 16 years old.  (Dkt. #64, at 2.)

The **second letter**, which Copeland also wrote and LP signed on June 9, 2009, states LP made the statements in the June 5, 2009 letter voluntarily and without coercion or bribery.  (Dkt. #1–1, at 4; R.T. 9/13/19, at 37–38.)

The **third letter**, which DP signed on August 7, 2009, contains the following statements (Dkt. #1, at 28):

- The charge in Count 6 was "false."
- "When [she] refused to accuse" Copeland of that crime, the investigating detective "called [her] a liar."
- "[LP] was taken from [her] and placed with AZ CPS.  [DP] was held in the Maricopa County Jail for 3 months.  The [prosecutor] told [her] that if [she] didn't say what they wanted [her] to, [the prosecutor] would see to it that [she] got 25 years … Not knowing any better [DP] gave in."

The Court assumed the statements made in the first and third letters above were true for purposes of determining whether an evidentiary hearing was warranted.  (Dkt. #64, at 2; *see also* Dkt. #28, at 12–13, 17–18.)

**B.**  ***2015 unsworn statements (6 total).***

**1.**  **Letters addressed to the magistrate judge (3 letters).**

Following the 2015 report and recommendation that recommended dismissing the habeas petition, the Court received three letters addressed to the authoring magistrate judge.  (Dkt. #23–24, #26.)  The letters were purportedly written by DP, LP, and Copeland's brother, but none were notarized to verify the signatories.  (*Id.*)

The **first letter**, dated February 5, 2015 and purportedly written and signed by DP, broadly espoused Copeland's innocence and listed but did not provide the documents she believed proved his innocence, which included the 2009 unsworn

statements.  (Dkt. #23.)

The **second letter**, dated February 12, 2015 and purportedly written and signed by Copeland's brother (Bobby), stated that, in addition to the 2009 unsworn statements, "there [were] … many items in the [Phoenix police department] report to refudiate [*sic*] these charges and all the other[s]."  (Dkt. #24.)  Bobby did not provide any such proof and did not cite to specific portions of the police report to support that claim.  (*See id.*)

The **third letter**, which Copeland wrote and LP signed on March 18, 2015, stated the "accusation against [Copeland] [was] false" because he did not have sex with LP or touch her inappropriately.  (Dkt. #26; R.T. 9/13/19, at 44–45.)  The letter further stated:

> I was young, scared, taken away from my family and with people all around me telling me I had to say these things.  They included my brother … a couple of aunts and the prosecutor.  I tried to tell them different, but they refused to hear me.  The Phoenix P.D. reports documents where I told the detective this didn't happen, and that my brother told me I had to say it.  Also the report shows my aunt [] telling the cops that [Copeland] only touched my face and arms.

(Dkt. #26.)

### 2.    Copeland's additional filings (3 letters).

Copeland filed three additional letters in November 2015.  (Dkt. #60.) While the letters were notarized, none of their statements was made under oath. (*See* Dkt. #60–1, #60–2, #60–3.)

The **first letter**, which DP signed on September 16, 2015[4], states: "The story of [LP] being groped and hurt under her clothing was made up for her b[y] the [prosecutor]."  (Dkt. #60–1, at 3.)  It further denies, as ever happening, the incident wherein LP went missing for several hours only to be found scared and lying on

---

[4] The letter does not indicate the year DP signed it, but subsequent filings suggest it was signed in 2015.

her back on Copeland's bed, with Copeland in the room.[5]  (*Id.*)  The letter claims that incident was impossible because Copeland was working that day and, Copeland's bedroom was always locked during the day.  (*Id.* at 3–4.)

The **second letter**, which Copeland wrote and LP signed on August 28, 2015, states: "The story the prosecutor coached me to say on the stand did not happen.  I was not groped under my bedding by my grandfather.  I always slept in the same room as my parents did and was never alone with my grandfather.  I was never afraid of my grandpa he was always nice and kind to me."  (Dkt. #60–2, at 3; R.T. 9/13/19, at 40–41.)  This letter also contained other statements not related to Count 3.  (*See* Dkt. #60–2, at 2–3; Dkt. #64, at 3.)

The **third letter**, signed by Copeland's son (James) on September 16, 2015[6], "discusses how family members were saying bad things to LP about [Copeland] after he was arrested and prior to his trial; that the [trial] Prosecutor … 'did [her] best to brainwash' LP; and that LP was not scared of [Copeland] but was instead vulnerable and easily manipulated because she was pulled away from her family." (Dkt. #64, at 2–3; #60–3 at 2–3.)

**C.**   ***LP's deposition.***

LP was 26 years old at the time of her deposition.  (*See* R.T. 9/13/19, at 61.) LP's deposition testimony provided the following information.

**1.   Her present memory.**

LP did not recall what happened to her as a child: she admitted she "ha[d] no recollection of anything from that time," nor any "independent knowledge" of "all the things that happened" on the night Count 3 occurred.  (*Id.* at 40, 78–79; *see id.* at 30, 73.)  More precisely, she did not recall her 2002 interviews with Dutton,

---

[5] KC described this incident at trial.  (Dkt. #15–2, at 102–05.)

[6] The letter does not indicate the year James signed it, but subsequent filings suggest it was signed in 2015.

1   anything she said during those interviews, any trial testimony she gave about being

2   either afraid of Copeland or touched by him, or about Copeland touching her

3   inappropriately.  (*Id.* at 14–16, 73–74, 82.)  LP admitted that, sometime in 2018,

4   Copeland via DP sent her a copy of the "police statements and everything" "[s]o

5   that [LP] could read them" because she did not recall anything.  (*Id.* at 39–40.)

6       LP admitted her memory of the events underlying Count 3 was better in

7   2002 than it was at the time of her deposition.  (*See id.* at 74.)  LP was even unsure

8   about how old she was when she testified at trial, first saying she had been eight

9   years old and later saying she had been twelve years old.  (*Id.* at 16, 74.)

10       **2.    Her adopted statements from 2009 and 2015.**

11       Among the six exhibits introduced at the deposition, four were the letters LP

12   signed in 2009 and 2015.  (*See* Dep. Exhs. 3–6.)  LP admitted Copeland wrote at

13   least three of them for her signature, with the fourth written by either Copeland or

14   DP.  (R.T. 9/13/19, at 27 [Exh. 3], 37–38 [Exh. 4], 40–41 [Exh. 5], 44–45 [Exh. 6].)

15       To explain why she did not personally write Exhibit 3 (the June 5, 2009

16   letter), LP testified she wanted to help Copeland in his appeal but did not have the

17   knowledge to write what would be helpful for him:

18       Q.    Do you know whose handwriting it is [on Exhibit 3]?

19       A.    Yes, I do.

20       Q.    Whose?

21       A.    It's my grandfather's.  But I asked him to do this for me

22   because there are certain things that—you know, on top of the stuff

23   that, you know, he knows about and everybody else knows about, the

    things that I don't know about that were put in here that I do know

24   happened but I couldn't say it in exactly the same way.

    . . . .

25       Q.    And how did you ask him to write it?

26       A.    I said, "Would you please mind writing the testimony

27   because there are things that you guys all know about that I don't, and,

    you know, I don't have any way of"—

28

Q.     Did you write him a letter asking him to write it?

A.     No, I hadn't.  I asked [DP] to ask him when she went to visit.

. . . .

A.     And so I asked her—I was like, "If he's getting ready to try to get out of there, have him write the things that he needs to write for me."  I was like, "So that I can do what I need to do so that this can all be over with because he doesn't deserve to be in jail."

. . . .

Q.     Whose idea was it to write a statement?

A.     It was my grandfather's, but I told him that whatever he needed to, let me know and I would have it done, because I don't remember any of the stuff that has been talked about in the report when you were reading me all the stuff about molestation and stuff. …

. . . .

Q.     [Copeland] sent [DP] a letter with [the 2009 letter] in it?

A.     Yes.  And then [DP] said … "this is … from [Copeland]." She said, "You need to read it and make sure that at least—that you understand what it's staying … [b]ecause… [y]ou need to have this notarized … And we need to make sure that everything for [Copeland] is right."

. . . .

Q.     Before this was written, did you sit down with [DP] and talk through what kinds of things should go in this statement?

A.     She said that … her and [Copeland] had known what had happened and what was all going on at that time, because I told you I don't remember much of it because I was just a little kid.  But [DP] told [Copeland] what she knew and what he knew, and I told [Copeland] to write the letter, and they did.

(*Id.* at 27–32.)

Regarding Exhibit 4 (the June 9, 2009 letter), LP testified she did not even expect to get it—DP just gave it to her after having received it in the mail from Copeland.  (*Id.* at 37–38.)  DP told LP at that time that Copeland considered Exhibit 4 necessary to avoid suspicions that LP may have been bribed or coerced

1    into signing Exhibit 3.  (*Id.*)  LP told DP in reply: "[O]kay."  (*Id.* at 38.)

2        LP testified that Copeland wrote Exhibit 5 (the August 28, 2015 letter)

3    "without input from [her]."  (*Id.* at 40, 42–43.)  Either Copeland or DP wrote

4    Exhibit 6 (the March 18, 2015 letter) and when DP gave the letter to LP, she told

5    LP "it was part of the forms … to get [Copeland] out of jail."  (*Id.* at 47–48.)

6        Despite her inability to recall what happened when she was a child, LP

7    testified the contents of those four letters were true.  (*Id.* at 49.)

8                    **3.    Copeland's alleged innocence.**

9        LP remembered only "good things" about Copeland, and generally

10   maintained that he "ha[d] never touched [her] in a sexual way"; he did not touch

11   her private parts; and she "ha[d] no reason to be scared of [him]."  (*Id.* at 16–18,

12   24; *see also id.* at 36, 51–52.)

13               **4.    LP's alleged "severe yeast infection."**

14       LP claimed she had "yeast infections from the time [she] was born and up

15   until [she] was about 13 years old," and recalled "scratching [her]self until [she

16   was] bleeding."  (*Id.* at 34.)  However, when asked if the yeast infections *caused*

17   her abnormal hymen, LP did not know:

18            Q.    And so how do you know that it was the scratching that
19       caused your hymen to become missing?

20            A.    I don't know that it was that that caused my hymen to be
         missing, but I do remember scratching.

21            Q.    Okay.  So you don't remember a doctor telling you that
22       your scratching—

23            A.    No.

24            Q.    —caused your hymen to be missing?

25            A.    No.

26   (*Id.* at 35.)  DP had supposedly taken LP to an emergency clinic in August 2001 to

27   treat the yeast infection, but LP could not recall where the clinic was or even if it

28   was close to where she had been living at the time.  (*Id.* at 34–35, 55.)

                                        19

Conversely, LP vividly recalled the first time she learned about her "missing" hymen, which was August 2001, the same month as her alleged emergency-room visit:

> A.   I knew what they told me at the doctor's office after they had done their thing, that my hymen was missing.  I didn't know what that had meant at the time, but I did know what they had said.
>
> Q.   And so what doctor's appointment are you talking about?
>
> A.   There was this doctor's appointment that I went to when I was about eight or nine, and they put me on a table and they told me to look up at the ceiling and count the starfishes.  And they took a swab and they were looking inside with a little camera thing.  And they said that there would—that my hymen was missing.
>
> . . . .
>
> Q.   Was it in connection with this case?
>
> A.   Yes, it was.
>
> Q.   So you were probably around eight or nine?
>
> A.   Yes.

(*Id.* at 33–34; Dkt. #15–3, at 7.)

LP expressed her willingness to sign a medical release form to obtain her medical records for the alleged ER visit.  (R.T. 9/13/19, at 82–83.)  To date, Copeland has not produced any documents regarding LP's history of yeast infections or a 2001 emergency-room visit.

### 5.   The alleged coercion of LP's trial testimony.

LP stated that the prosecutor had coerced her into testifying against Copeland at trial, and she had submitted because she was scared and alone.  (*Id.* at 17–20.)  The prosecutor had supposedly given LP an ultimatum:

> A.   There were some things that happened during the — where they were prepping me for this, and they were — I was told to say that.
>
> . . . .

Q.     And at that point, you were still living with one of your [uncles and aunts]?

A.     Yes.

. . . .

Q.     Okay.  And did [the prosecutor] give you any further description of what you should say?

A.     She just said — she said, "I'm going to ask you if [Copeland] ever touched you on your private parts."  She's all, "And whenever I ask you that question, I want you to say yes."

Q.     And so what did she say about going home to your parents?

A.     She said that was the only way I was going to go home.

(*Id.* at 17–18; *see id.* at 53, 76.)  Meanwhile, DP was telling LP that Copeland had not touched her (LP) inappropriately.  (*Id.* at 18, 76–77.)

LP claimed it was not until six months after the trial had concluded that she was able to finally return to her parents.  (*Id.* at 53.)

### 6.     Her present relationships with Copeland and DP.

LP has maintained contact with Copeland over the years.  (*Id.* at 25.)  He writes to her often and sends holiday cards.  (*Id.*)  LP testified: "Because he's my grandfather, and … even though I testified the way I did, he knows why.  And I've written him a letter telling him why and what had happened, you know.  So I know he was not mad at me."  (*Id.* at 44.)  LP has not tried to visit Copeland in prison.  (*See id.* at 26.)

DP, on the other hand, visited Copeland and acted as a messenger between LP and Copeland.  (*Id.* at 26, 28, 37–38, 40–41, 46–47.)  LP testified she is close with DP.  (*Id.* at 66.)  They talk "just about every night" and, at least once, have discussed "when [they] were going to meet with [Copeland's counsel]."  (*Id.* at 50, 66.)

**IV.    COPELAND FAILS TO SATISFY HIS BURDEN OF PROOF.**

An actual-innocence determination is dispositive of whether this Court may entertain Copeland's otherwise untimely habeas petition and procedurally defaulted IAC claims (Dkt. # 28, at 1–3, 13, 18).  *See McQuiggin*, 569 U.S. at 386.

**A.    *Copeland's proffered evidence does not constitute new, reliable evidence.***

Copeland has produced only unreliable and incredible information to support his actual-innocence-gateway claims and thus fails to overcome the first hurdle of the *Schlup* analysis, rendering any further analysis unnecessary.

**First**, the 2009 and 2015 written statements lack the requisite reliability for several reasons.  None of the statements were made under oath and nothing about them indicates their purported authors were obliged or incentivized to tell the truth. *See In re Mbunda*, 484 B.R. 344, 354 (9th Cir. 2012) (concluding that proffered statements lacked the required circumstantial guarantees of trustworthiness because "[they] were not made under oath" and "[t]here was no showing that [the declarant] was under any obligation or incentive to tell the truth"); *cf. United States v. Leal–Del Carmen*, 697 F.3d 964, 974 (9th Cir. 2012) (acknowledging that an interview taken under oath is a mark of trustworthiness) (citation omitted).

The purported authors and signatories—Copeland's daughter (DP), granddaughter (LP), brother (Bobby), and son (James)—are interested parties with inherent motives to lie.  Their unsworn letters are thus not dependable resources when determining Copeland's actual innocence for any claim.  *See House*, 547 U.S. at 552 (noting that testimony by friends or relations of the accused might have less probative value than testimony from disinterested witnesses); *Jones v. Taylor*, 763 F.3d 1242, 1249 (9th Cir. 2014) ("The recantations are all from Jones' family members, which reduces their weight and reliability."); *United States v. Redlightning*, 624 F.3d 1090, 1118 (9th Cir. 2010) (declining to admit hearsay statement was not an abuse of discretion partly because the declarant had a motive

to lie and the statement itself was not sworn); *McCray v. Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007) (finding the brother, sister, and aunt's post-trial affidavits unpersuasive evidence of habeas petitioner's innocence partly because "family members[] have a personal stake in exonerating [the petitioner]"); *cf. Figgie*, 994 F.2d at 608 (concluding consumers' letters had sufficient guarantees of trustworthiness partly because they were sent for reasons unrelated to the case by unrelated members of the public who had no motive to lie).

More concerning, Copeland wrote at least three, and perhaps all, of the letters LP signed, with no input from LP. (*See supra*, Section III(C)(2).) *See Little v. Streater*, 452 U.S. 1, 8 (1981) ("[T]he self-serving testimony of a party is of questionable reliability.") (internal quotation marks and citation omitted); *United States v. Patayan Soriano*, 361 F.3d 494, 513 (9th Cir. 2004) (Berzon, J., dissenting) ("[S]elf-serving statements [are] inherently suspect and thus insufficiently reliable[.]"); *Matter of Extradition of Santos*, 228 F. Supp. 3d 1034, 1051 (C.D. Cal. 2017) ("Ordinarily, the fact that a statement is a recantation or is self-serving tends to diminish its credibility.").

Furthermore, the letters were first created approximately 7 years after Copeland's trial—without any explanations for such delay—and were signed in clusters: the 2009 letters were signed within 2 months of each other; the first set of 2015 letters were signed within 1.5 months of each other; and the second set of 2015 letters were signed within a month of each other. (*Supra*, Sections III(A)–(B).) This concerted effort by family to free Copeland, years after the trial, renders the letters especially unreliable. *See Jones*, 763 F.3d at 1249 (finding three recantations unreliable because their timing "cast[ed] some doubt on their veracity," where each recanting witness had come forward "at roughly the same time, years after trial, and only one of them provided a reason for the delay") (citations omitted); *Christian v. Frank*, 595 F.3d 1076, 1084 (9th Cir. 2010) (finding a recantation statement made more than ten years after the event in

1   question "especially unreliable").

2       Equally significant is the letters' handwriting.  The handwriting in LP's 2009

3   letters appear similar to the handwriting in DP's 2009 letter and Bobby's 2015

4   letter—and matches the handwriting in Copeland's prior filings (*see* Dkt. #1, at 28;

5   #1–1, at 7, 9–19); the handwriting in LP's March 18, 2015 letter appear similar to

6   the handwriting in DP's 2015 letters; and the printed (non-cursive) handwriting in

7   LP's March 18, 2015 letter appear similar to the handwriting in James's 2015 letter.

8   *See United States v. Woodson*, 526 F.2d 550, 552 n.1 (9th Cir. 1975) ("Lay people

9   are perfectly entitled to arrive at their own conclusion about the similarity of one

10  document with another as to the person who produced it.").  These noticeable

11  similarities in handwriting, in conjunction with LP's testimony that Copeland

12  wrote her letters, is probative and suggests Copeland—who has been described as

13  controlling and manipulative (*supra*, Section I(A)(5))—has orchestrated the

14  creation of the allegedly exculpatory evidence.  *Cf. United States v. Grammer*, 513

15  F.2d 673, 677 (9th Cir. 1975) (finding evidence of the defendant's handwriting

16  relevant and probative in determining who signed stolen checks).

17      The letters DP signed are untrustworthy for two additional reasons.  They

18  recant DP's trial testimony in several respects—her sexual relations with Copeland

19  during the charged time period and her reasons for (or lack thereof) to testify about

20  those sexual encounters—and, as such, are inherently suspicious.  *See Dobbert v.*

21  *Wainwright*, 468 U.S. 1231, 1233 (1984) ("Recantation testimony is properly

22  viewed with great suspicion.") (Brennan, J., dissenting from denial of certiorari);

23  *Jones*, 763 F.3d at 1249 ("As a general matter, [r]ecantation testimony is properly

24  viewed with great suspicion.  Recanting testimony is easy to find but difficult to

25  confirm or refute ….  It upsets society's interest in the finality of convictions, is

26  very often unreliable and given for suspect motives ….  For these reasons, a

27  witness' later recantation of his trial testimony does not render his earlier testimony

28  false.") (internal quotation marks and citations omitted); *Allen v. Woodford*, 395

F.3d 979, 994 (9th Cir. 2005) (same); *Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003) (observing that "recanting affidavits and witnesses are viewed with extreme suspicion by the courts"); *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) (en banc) (Kozinski, J., dissenting) ("Appellate courts … look upon recantations with extreme suspicion.") (collecting cases from the Second, Fifth, Seventh, and Eleventh Circuits); *United States v. Lewis*, 338 F.2d 137, 139 (6th Cir. 1964) ("[R]ecantation is looked upon with the utmost suspicion ….") (citation and internal question marks omitted).

Also, DP's failure to appear for her deposition to defend her recantation statements under penalty of perjury has destroyed any credibility her statements may have had, as well as jeopardized DP's present-day credibility. *See In re Mickens*, 312 B.R. 666, 678 (N.D. Cal. 2004) (finding debtors' testimony not credible because they inexplicably "chose not to appear at trial, which tends to support a negative inference that they may have sought to avoid cross-examination under oath" and they were not corroborated); *cf. United States v. Schuler*, 813 F.2d 978, 981 & n.3 (9th Cir. 1987) (determining witness credibility necessarily requires consideration of the witness's demeanor). Along those lines, DP's history of recanting, after having reported Copeland for sexual misconduct (the Tucson case), further highlights the insincerity of her present recantation. (*Supra*, Section I(A)(5).)

**Second**, despite being made under oath, LP's deposition testimony about Copeland's alleged innocence is fundamentally not reliable because LP admittedly has no independent memory of the events underlying Count 3. (*Supra*, Section III(C)(1).) She even claimed to have no personal knowledge of the events from that time of her life, which consequently had prohibited her from writing her own letters in 2009 and 2015. (*Supra*, *id.*) Additionally, LP agreed, in effect, that her *present* memory of those events and other related events was *not* as reliable as her memory in 2002, when she was able to recall in her interviews with Dutton that

1   Copeland had sexually touched her in a hurtful manner.   (*See supra*, Sections

2   I(A)(1), III(C)(1).)

3         Rather than being based on LP's own recollections, LP's present "memory"

4   of the relevant time period appears to consist of, or be based entirely on,

5   Copeland's self-serving version of events.   Copeland and perhaps DP wrote the

6   letters LP signed, and may have even written all the other 2009 and 2015 unsworn

7   letters, as discussed above.   (*See also supra*, Section III(C)(2).)   LP admittedly

8   gave no input as to what was written in the letters (*supra*, *id.*)—in leaving that task

9   entirely up to Copeland and DP, it is reasonable to conclude that LP

10   unconditionally accepted their version of events as true before she even knew what

11   they were.   Also, at Copeland's direction, DP gave LP a copy of what LP believed

12   was the police report in order to fill-in LP's blank memory (*supra*, Section

13   III(C)(1)), suggesting Copeland wanted to control what information LP knew in

14   preparation for a deposition.

15         Absent an independent recollection of Count 3, or any other count involving

16   her, and the events surrounding that crime, LP's adoption of the statements made in

17   the 2009 and 2015 letters is meaningless—LP is incapable of verifying Copeland's

18   self-serving statements as true, just as she is now incapable of providing reliable

19   testimony about Copeland's innocence for Count 3.   *See Sirhan v. Galaza*, 76

20   F.Supp.3d 1073, 1116–17 (C.D. Cal. 2015) (rejecting as evidence of the

21   petitioner's actual innocence an eyewitness's recent declaration that contradicted

22   statements she gave to law enforcement in 1968, because the passage of time

23   "diminishe[d] the reliability of [the declarant], and therefore, of her declaration"

24   and "no contemporaneous statements by [her]" existed "that corroborate[d] her

25   current recollection of events" that occurred "45 years in the past"); *State v.*

26   *Parker*, 296 P.3d 54, 63–64 (Ariz. 2013) (finding no error in excluding witness

27   from testifying about a hearsay statement she previously told police because it

28   lacked sufficient indicia of reliability where the witness had "no independent

recollection" or "memory whatsoever of [the declarant] making the statement or of telling police about it"); *cf. Cooper v. Brown*, 510 F.3d 870, 967 (9th Cir. 2007) (concluding that the testimony of trial witnesses "have greater weight compared to additional witnesses" with 20-year-old recollections that "are not as reliable"); *Los Angeles Times Commc'ns, LLC v. Dep't of Army*, 442 F. Supp. 2d 880, 887 (C.D. Cal. 2006) ("The hearsay rule operates to exclude evidence that lacks reliability due to faults in the perception, memory, or narration of the declarant.").

Moreover, LP's motive for helping Copeland years after testifying against him is suspect.  LP was a child victim of sexual abuse, and one scholar has written:

> After the child has disclosed the incident, it is not unusual for the child to deny later that the abuse occurred.  Child victims of sexual abuse are frequently influenced by the father and other family members to retract or recant their story so that family life will return to 'normal.'

Elaine R. Cacciola, Comment, *The Admissibility of Expert Testimony in Intrafamily Child Sexual Abuse Cases*, 34 UCLA L. Rev. 175, 188 (1986).  *See also Myatt v. Hannigan,* 910 F.2d 680, 685 n.2 (10th Cir.1990) ("[T]he child's recanting of her statement to family members is not atypical in sex abuse cases."); Summit, *Child Abuse Accommodation Syndrome,* 7 Child Abuse & Neglect 177, 188 (1973) ("[W]hatever a child says about sexual abuse, she is likely to reverse it.").  LP's consistent contact with Copeland, her close relationship with DP (who apparently has remained close to Copeland herself), and her willingness to blindly accept whatever DP and Copeland give or tell her, sufficiently demonstrates LP's susceptibility to Copeland and DP's influences.  (*See supra*, Sections III(C)(1)–(2), (6).)

Guilt and remorse may also be LP's motivation.  LP wanted to ensure Copeland was not mad at her and so she wrote to Copeland to explain what happened at trial and why she testified as she had.  (*Supra*, Section III(C)(6).)  She also offered her help to appeal his convictions, telling him she was willing to do

27

whatever she could to help.   (*Supra*, Section III(C)(2).)   Such testimony demonstrates LP harbors some feelings of guilt and remorse for her role in convicting Copeland.   It is thus reasonable to infer that LP's current position regarding Copeland's alleged innocence, and the related allegations of coerced trial testimony and severe yeast infection, is more so a byproduct of her guilt and remorse than truth.

Whether LP's motive is the result of family influence or guilt and remorse, it taints the reliability and trustworthiness of her current "memory."   Simply put, LP's testimony about the events surrounding Count 3 is neither trustworthy nor reliable.   *See United States v. Rouse*, 410 F.3d 1005, 1009 (8th Cir. 2005) (explaining that the tendency to recant "is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon, particularly when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story.") (internal quotations omitted); *United States v. Provost*, 969 F.2d 617, 621 (8th Cir. 1992) ("Recantation is particularly common when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story."); *accord Myatt*, 910 F.2d at 685.

And finally, LP's testimony about alleged coercion contradicts facts that more than one witness established at trial, thereby calling her present-day credibility into question.   While LP claimed the prosecutor had threatened to keep her away from her family unless she testified against Copeland, LP had already been returned to her parents by the time she had testified at trial.   (*Supra*, Section III(C)(5).)   It is thus implausible that LP's trial testimony against Copeland had been coerced in the manner Copeland, through LP, has alleged.

Given they are unreliable, LP's deposition testimony and all the unsworn written statements cannot affirmatively prove Copeland's actual innocence for Count 3 or 6.   *See Schlup*, 513 U.S. at 324.

**Third**, Copeland has not proffered any independent, reliable evidence to verify whether LP's medical history includes a history of severe yeast infections or an emergency-room visit in August 2001.  The unsworn letters signed by DP and LP do not constitute reliable evidence for the reasons already discussed.  LP's demonstrated willingness to help Copeland as early as 2009, and her expressed willingness to sign a medical release form in September 2019, (*supra*, Sections III(C)(2), (4)) has given Copeland the opportunity and at least 10 years to obtain LP's medical records.  The absence of such records speaks volumes about Copeland's yeast-infection theory as the cause of LP's abnormal hymen.

**Four**, Copeland has not proffered any evidence from either Detective Barker or the trial prosecutor to support DP's and LP's allegations of coercion (*see supra*, Section II)—in fact, as discussed below, the trial evidence practically refutes this accusation entirely (*infra*, Section IV(B)).  And given Copeland's intention to not present any live witnesses at the now-vacated evidentiary hearing (*supra*, Section I(B)) and given the unsworn written statements are unreliable, as discussed, Copeland has no means of confirming the statements made in the letters specifically signed by James and Bobby.

Since Copeland has not proffered any new, *reliable* evidence to show his actual innocence of Counts 3 and 6, he fails to satisfy *Schulp*'s demanding standard as a matter of law, and this Court need not consider what properly instructed jurors would have done if they had deliberated Copeland's guilt for Counts 3 and 6 based on this supplemented record.  *See Jones*, 763 F.3d. at 1251 ("There is no 'new and reliable physical evidence, such as DNA, that would preclude any possibility of [the petitioner's] guilt.'  Nor is there scientific or testimonial evidence even as persuasive as the evidence in *House* [*v. Bell*] and *Jackson* [*v. Calderon*, 211 F.3d 1148 (9th Cir. 2000)], which was found to be insufficient.  The recantations here are not from disinterested eyewitnesses, and, although victim recantation might in some instances be evidence of innocence, for the reasons discussed above, the

1   recantation here is not sufficiently reliable that we can conclude that *every juror*
2   would credit it.  …. We, therefore, cannot say that 'in light of the new evidence, no
3   juror, acting reasonably, would have voted to find [Jones] guilty beyond a
4   reasonable doubt.'    Accordingly, we hold that Jones has not made the
5   'extraordinarily high' and 'truly persuasive' showing required ….") (emphasis
6   added, internal citations omitted); *Doe*, 391 F.3d at 172 ("[I]t is not necessary to
7   apply the *Schlup* "no reasonable juror" standard because Doe has not presented any
8   new reliable evidence ….").

9       **B.   *Even if the second step of the* Schlup *analysis is reached,***
10          ***Copeland's claim relating to Count 3 fails.***

11          Assuming *arguendo* the Court proceeds to the second step of the *Schlup*
12   analysis for Copeland's actual-innocence-gateway claim relating to Count 3, the
13   claim still fails.  LP's deposition—arguably the only proffered evidence with any
14   sort of indicia of reliability—offers, at most, four pieces of information: **(1)** LP
15   denied Copeland having ever touched her; **(2)** LP may have a history of yeast
16   infections before and around the time Count 3 occurred and it caused her to scratch
17   herself and sometimes bleed, and LP saw a doctor in August 2001 to treat her yeast
18   infections;  **(3)** leading up to her trial testimony, LP was scared, afraid, and wanted
19   to go home; and **(4)** LP believed the prosecutor was coercing her into testifying
20   against Copeland, and the only way she was going to be allowed to return to her
21   parents was if she testified that Copeland had touched her.  Such information does
22   not undermine Copeland's conviction for Count 3 (or his conviction for Count 6).

23          **First**, LP's deposition testimony regarding Copeland's alleged innocence
24   basically recants her 2002 video-recorded interview statements but, as previously
25   discussed, recantations are inherently suspect—that is even more so the case here
26   where the recanting witness is a remorseful child victim of her grandfather's sexual
27   misconduct, who admittedly has no recollection of the relevant time period.  No
28   reasonable juror would give that information much weight when the trial evidence

1    included: **(1)** Dr. Coffman's expert opinion about the likely and unlikely causes of

2    LP's abnormal hymen, especially her opinion that only a freak impaling-type of

3    accident would cause hymenal abnormalities like LP's (*supra*, Sections I(A)(1)–

4    (2)); **(2)** Dr. Coffman's testimony that, during her exam of LP, she did not observe

5    any external genital injuries or any indications LP had suffered a previous

6    significant genital injury that could have caused trauma to her hymen (*supra*, *id.*);

7    **(3)** LP's video-recorded forensic interviews—the jurors watched LP's demeanor

8    change (coloring more intensely and retreating) as Dutton questioned her about

9    Copeland's inappropriate touching that hurt her (*see* Dkt. #112: 8:45–10:00, 11:45–

10   12:25, 12:40–14:00; *see also* Dkt. #15–2, at 177–78); and **(4)** the testimonies of

11   Copeland's adult daughters and stepdaughters, each of whom described their

12   childhoods when Copeland began sexually touching them, establishing Copeland

13   had a pattern of engaging in sexual misconduct with his female relations when they

14   were still minors (Dkt #15–3, at 27–28, 32–35, 43–44, 69–80, 148, 151–5; *supra*,

15   Section I(A)(5)).

16       **Second**, even if LP's history of yeast infections is true, no reasonable juror

17   would find such information necessarily exculpatory.  Significantly, LP did not

18   testify that a yeast infection caused her abnormal hymen (*supra*, Section III(C)(4)),

19   nor is there anything reliable to that effect in the supplemented record.  A juror

20   could thus conclude LP had a history of yeast infections and had an infection occur

21   in August 2001, but the symptoms were not proportionate with impalement and

22   were not otherwise severe, especially considering, that same month, Dr. Coffman

23   saw no sutures, scar tissue, bruising, abrasions, or even redness during her

24   examination of LP (*supra*, Sections I(A)(1)–(2)).

25       **Third**, LP being scared before and up to the trial was cumulative to LP's

26   trial testimony.  (*Supra*, Section I(A)(3).)  It did not appear to affect the jury's

27   deliberation for Count 3 then and likely would not affect a reasonable juror's

28   deliberation now.

1    **Four**, no reasonable juror would give LP's deposition testimony about

2   alleged coercion by the prosecutor much weight when three witnesses, one of

3   whom was neither DP nor LP (Ernest), verified independently that, by the time of

4   trial, LP was already living back at home with DP.   (*Supra*, *id.*)   In any event, LP's

5   trial testimony was relatively insignificant in comparison to Dr. Coffman's and

6   Dutton's testimonies and the video evidence of LP's forensic interviews.

7        In sum, even if the substance of LP's deposition was presented to a

8   reasonable juror, a reasonable juror could easily disregard it given its unreliability

9   and instead rely upon LP's 2002 video-recorded forensic interviews, and upon

10   Dutton and Dr. Coffman's consistent and corroborating testimonies, all of which

11   proved Copeland's guilt.   *See Jones*, 763 F.3d at 1248–51 (recantation testimony of

12   molestation victim and relatives did not establish the Petitioner's actual innocence,

13   given their suspect motives, their delay in coming forward, their prior inconsistent

14   statements, and other evidence of guilt) (collecting cases); *Christian*, 595 F.3d at

15   1084 n.11 ("During the evidentiary hearing before the district court, Schmidt

16   recanted his identification of Christian and instead claimed that Burkhart was the

17   person he saw leaving the crime scene.   Schmidt's recantation does not change our

18   conclusion that the Hawaii Supreme Court's decision was reasonable.   Schmidt's

19   'later recantation of his trial testimony does not render his earlier testimony

20   false[.]'") (quoting *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005));

21   *Carriger*, 132 F.3d at 483 (*en banc*) (Kozinski, J., dissenting) (noting that courts

22   look upon recantations with extreme suspicion") (collecting cases from the Second,

23   Fifth, Seventh, and Eleventh Circuits).

24        On a final note, LP provided no testimony in her deposition with regard to

25   Count 6.   (*See supra*, Section III(C).)   The only proffered evidence regarding

26   Count 6 thus consists of unsworn, untrustworthy letters signed by an evasive DP.

27   Such information does not undermine DP's trial testimony, made under penalty of

28   perjury and subject to cross-examination.

## V.    CONCLUSION.

Copeland fails to satisfy *Schlup*'s demanding standard for actual-innocence-gateway claims.  Accordingly, based on the foregoing authorities and arguments, Copeland's untimely habeas petition and procedurally defaulted IAC claims must be dismissed, without reviewing the merits.  The State respectfully requests the Court dismiss the habeas petition and its outstanding claims with prejudice.

RESPECTFULLY SUBMITTED this 14th day of February, 2020.

Mark Brnovich
Attorney General

Joseph T. Maziarz
Chief Counsel

s/ Gracynthia Claw
Assistant Attorney General

s/ Erin Bennett
Assistant Attorney General

Attorneys for Respondents

1

**CERTIFICATE OF SERVICE**

2
3
4

I hereby certify that on February 14, 2020, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and served the attached document by mail on the following, who is not a registered participant of the ECF System:

5
6
7

Alfred Copeland, #171877
ASPC Eyman – Cook Unit
P.O. Box 3200
Florence, Arizona 85132

8

Petitioner, Pro Se

9

s/ J. Adams

10
11

8011779

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28