**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alfred Copeland, | No. CV-13-02278-PHX-JJT |
| Petitioner, | **ORDER** |
| v. | |
| David Shinn, *et al.*, | |
| Respondents. | |

At issue is whether Petitioner has sufficiently established his actual innocence of Counts 3 and 6 of the Indictment—which correspond to Grounds 1 and 2 of his Habeas Corpus Petition. Grounds 1 and 2 allege ineffective assistance of trial counsel (IAC) relating to Counts 3 and 6. However, Petitioner's IAC claims are defaulted and barred unless the Court concludes that Petitioner has shown his actual innocence of Counts 3 and 6. For the following reasons, the Court concludes that he has not.

**I.     BACKGROUND**

In June 2015, Judge Rosenblatt ordered an evidentiary hearing in this matter to determine whether Petitioner could sufficiently establish his innocence of Counts 3 and 6 to pass through the *Schlup* "gateway" and receive substantive consideration of his IAC claims. (Doc. 28.) *Schlup v. Delo*, 513 U.S. 298 (1995). On January 23, 2020, this Court vacated the evidentiary hearing upon the Parties' joint request and ordered simultaneous briefing on whether Petitioner has met his burden of proving actual innocence under *Schlup*. (Doc. 143.)

The Court has reviewed the Parties' briefs and all of the evidence. It sets forth the relevant factual and procedural history below.

### A. Petitioner's Trial

In 2002, a jury convicted Petitioner of 11 counts of sexual misconduct, including Count 3 (sexual conduct with a minor) and Count 6 (incest). (Doc. 15–4 at 140–43.) LP, Petitioner's granddaughter, was the victim of Count 3, and DP, Petitioner's daughter, was the victim of Count 6.[1] Specifically, Count 3 charged Petitioner with intentionally or knowingly engaging in sexual intercourse or oral sexual contact with LP while she was under 15 years old between February 1, 2001 and August 24, 2001. (Doc. 1 at 17–18.) Count 6 charged Petitioner with committing incest with DP between January 1, 2001 and August 24, 2001. (Doc. 1 at 18–19.)

Various witnesses testified against Petitioner and described his charged and uncharged sexual conduct over the span of decades. Several members of his family testified, including LP, DP, Tracy Beauchamp (Petitioner's daughter), Carla Grant (Petitioner's stepdaughter), Kathy Underwood (Petitioner's stepdaughter), Ernest Copeland (Petitioner's son), and KC (Petitioner's grandson). (Doc. 15–2, 15–3, 15–4.) Other witnesses testified for the State, including child forensic interviewer Wendy Dutton, pediatrician Dr. Catherine Coffman, and Phoenix Police Detective Jerry Barker. (Doc. 15-2, 15–4.)

#### 1. Trial Evidence proving Count 3.

LP testified that she did not remember or did not know the answer to several questions regarding Petitioner. She never specifically testified that Petitioner had sexual intercourse or oral sexual contact with her. (Doc. 15–2 at 139, 146–47). However, LP testified that Petitioner touched her on her "private." (Doc. 15–2 at 135.) Specifically, LP testified that Petitioner touched her in the living room while she was sleeping. (Doc. 15–2 at 137.) She testified there were no other times that Petitioner touched her on her private.

---

[1] Count 6 corresponds to Petitioner's IAC claim in Ground 1 of his habeas petition. (Doc. 28 at 10.) Count 3 corresponds to his IAC claim in Ground 2. (Doc. 28 at 13.)

(Doc. 15–2 at 138.) LP also testified that Petitioner pinched her chest but could not remember if anything ever happened to the inside of her private. (Doc. 15–2 at 140.) Finally, she testified that she was afraid of Petitioner but was not afraid of other family members, and that other family members had not done anything to her private areas but she was unsure whether Petitioner had. (Doc. 15–2 at 144–46.)

LP did not remember her interviews with forensic interviewer Wendy Dutton, but Dutton testified at trial regarding those interviews. (Doc. 15–2 at 159.) LP did not disclose abuse during the first interview, but she did so disclose during the second interview six months later. (Doc. 15–2 at 175.) During the second interview LP described various acts by Petitioner, including: (1) touching her in places he was not supposed to, (2) locking her in his room, (3) touching her "fish," (4) hurting and pinching her, (5) touching her under her clothes, and (6) touching her in DP's room. (Doc. 107, Ex. F; Doc. 112.) This interview was played for the jury at trial. (Doc. 15–2 at 177.)

Dr. Coffman, a pediatrician who specializes in child abuse evaluations, testified regarding her August 30, 2001 evaluation of LP. (Doc. 15–3 at 4.) Dr. Coffman testified that LP's hymen was abnormal and the missing and narrowed hymenal tissue indicated that LP's vaginal canal had been repeatedly penetrated. (Doc. 15–3 at 13–20.) These findings were consistent with sexual abuse. (Doc. 15–3 at 20.) Dr. Coffman also rejected the possibility that LP's abnormal hymen was caused by an accidental injury. (Doc. 15–3 at 17–19.)

KC and Cathy Underwood both testified about an incident where LP went missing from home for some amount of time. (Doc. 15–2 at 102, Doc. 15–3 at 83.) KC testified that two weeks before Petitioner was arrested, LP could not be located after school and members of the family went looking for her. (Doc. 15–2 at 102–05.) They called her name throughout the house but could not find her for 30 minutes according to KC. KC found her in Petitioner's bedroom after he knocked on Petitioner's bedroom door and called his name repeatedly. It took Petitioner five minutes to open the door, and when he did KC saw LP laying on his bed staring at the ceiling. Cathy Underwood described the incident similarly,

except she testified that they looked for LP for over two hours and when Petitioner opened the door he was in his underwear. (Doc. 15–2 at 85–87.)

### 2. Trial evidence proving Count 6.

DP testified that she had sex with Petitioner during the Summer of 2001. (Doc. 15–3 at 122.) She also testified that they first had sex when DP was 13 years old and that her first sexual encounter with Petitioner was when she was five years old, but he blamed the encounter on her. (Doc. 15–3 at 114, 116–17.) She had previously accused Petitioner of sexual misconduct in the 1970's but recanted after being pressured by her mother and grandmother. (Doc. 15–3 at 120–21.)

DP was the only witness who testified that she had sex with Petitioner during the relevant period. However, other witnesses testified about uncharged sexual activity they witnessed between DP and Petitioner. KC testified that DP told him Petitioner had molested DP since adolescence. (Doc. 15–2 at 92–93.) Carla Grant described sexual acts Petitioner made her participate in with DP and Petitioner. (Doc. 15–3 at 32–35.) Cathy Underwood testified that she witnessed Petitioner sexually touch DP and that Petitioner told her that he had sex with DP. (Doc. 15–3 at 77–78.) Tracy Beauchamp testified that Petitioner told her that he impregnated DP when she was 19 and made her have an abortion. (Doc. 15–4 at 16.)

The trial court's instructions allowed the jurors to consider circumstantial evidence in deciding the case. (Doc. 15–4 at 61–63.) Jurors could also consider whether Petitioner had a character trait that predisposed him to commit the charged crimes if they determined by clear and convincing evidence that he committed other uncharged illicit sexual acts. (Doc. 15–4 at 63–64.) Nevertheless, the jury could not convict Petitioner simply because of his character or because he committed prior illicit sexual acts. (Doc. 15–4 at 64.) Finally, the trial court instructed the jurors to decide each count separately. (Doc. 15–4 at 63.)

. . . .

. . . .

. . . .

### B. DP's and LP's recantations.

#### 1. The 2009 Letters

Petitioner attached to his habeas petition notarized letters signed by DP and LP in 2009 that recanted their trial testimony, alleged coercion and coaching of their testimony by the State, and offered an alternative cause for LP's abnormal hymen. (Doc. 1 at 28, Doc. 1–1 at 3.) LP's letter was signed on June 5, 2009 (LP Letter 1). (Doc. 1–1 at 3.) DP's letter was signed on August 7, 2009 (DP Letter 1). (Doc. 1 at 28.) LP claimed that she testified against Petitioner because she had been taken away from her family, and that a severe yeast infection and attendant scratching likely caused her abnormal hymen. (Doc. 1–1 at 3.) DP claimed that the incest charge was false and that the State coerced her testimony against Petitioner by threatening her with prison time and losing LP. (Doc. 1 at 28.) LP reaffirmed her first letter in a second letter dated June 19, 2009 (LP Letter 2) and added that her recantation was not the product of coercion or influence. (Doc. 1–1 at 4.)

#### 2. The 2015 Letters

After Magistrate Judge James Metcalf issued a Report and Recommendation to dismiss Petitioner's habeas petition in 2015, Petitioner submitted additional letters purportedly authored by LP and DP. (Doc. 23, 24, 26.) LP's letter was signed on March 18, 2015 (LP Letter 3). (Doc. 26.) DP's letter was signed on February 5, 2015 (DP Letter 2). (Doc. 23.) These letters generally recanted LP's and DP's trial testimony, and LP specifically claimed that her aunts, her brother, and the prosecutor told her she had to accuse Petitioner. However, these letters were not notarized.

Petitioner submitted additional letters in 2015 signed by LP and DP. LP's letter was signed on August 28, 2015 (LP Letter 4). (Doc. 60–2 at 2–3.) DP's letter is unsigned, but it was notarized in 2018 and filings indicate it was drafted in 2015 (DP Letter 3). (Doc. 60–1 at 3.) DP's letter disputes that Petitioner groped LP under her clothes or hurt her, and asserts this claim was made up by the prosecutor. (Doc. 60–1 at 3.) The letter further states that the incident when LP was missing and found in Petitioner's room did not happen.

(Doc. 60–1 at 3–4.) LP's letter recants her testimony and claims she was coached to incriminate Petitioner. (Doc. 60–2 at 3.)

### 3. DP's 2015 Telephonic Interview

On September 21, 2015, DP participated in a telephonic interview with counsel for Petitioner and Respondents. (Doc. 148.) During the interview DP stated that there was never any sexual contact between her and Petitioner and that she was coerced by the prosecutor to testify that there was. (Doc. 148 at 9–10.) She also stated that she understood she could be charged with perjury for recanting her testimony if she testified consistent with her recantation. (Doc. 148 at 10.) She claimed that she drafted some of the recantation letters authored by her and LP despite the inconsistent handwriting across the letters. (Doc. 148 at 6.)

Specifically, DP claimed that she was threatened with going to prison for 25 years unless she inculpated Petitioner. (Doc. 148 at 11.) . She also described an incident where she took LP to an emergency clinic because LP had a yeast infection and scratched herself and caused herself to bleed. (Doc. 148 at 15–16.) However, she did not have any medical records to corroborate the event. (Doc. 148 at 15–16.) Respondent's counsel asked DP questions regarding the timing of her recantations and the circumstances surrounding DP's trial testimony and the alleged coercion. DP claims she wrote Petitioner one month after trial explaining why she erroneously accused him. (Doc. 148 at 23–25.) She also claims she waited years to officially recant because there was no longer a risk of her losing her children. (Doc. 148 at 26.) Finally, DP stated that she would likely be unable to attend a live hearing or deposition because of financial hardship. (Doc. 148 at 48.)

### 4. LP's 2019 Deposition

LP appeared for a deposition on September 13, 2019. (Doc. 152.) LP admitted to an incomplete recollection of everything that happened during the time period surrounding Petitioner's trial. (Doc. 152 at 73.) However, she testified unequivocally that Petitioner did not touch her sexually and that she would remember if he did. (Doc. 152 at 16.) She also testified that she testified untruthfully at trial and did so because she was coached by the

prosecutor and was told that her testimony was the only way she could return home after she was taken from her parents' custody. (Doc. 152 at 18–19.) Furthermore, she claimed that she had a history of yeast infections and previously had scratched herself until she bled. (Doc. 152 at 34.) She could not say whether the infections caused her abnormal hymen, but she stated that DP took her to an emergency clinic in August 2001 for treatment. (Doc. 152 at 35.) Finally, she adopted the recantations in the letters submitted by Petitioner but claimed that Petitioner drafted LP Letters 1, 2, and 4, and that Petitioner or DP drafted LP Letter 3.

## II. LEGAL STANDARDS

A habeas court can reach a petitioner's procedurally defaulted or barred substantive claim if the petitioner passes through the *Schlup* actual innocence gateway. *Schlup*, 513 U.S. at 314–15. This occurs when the petitioner provides evidence of his "innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 316. The gateway is not itself substantive relief; it provides only a path to consideration of an otherwise barred claim for substantive relief. The gateway exists to prevent "a fundamental miscarriage of justice." *Id.* at 314–15. Tenable actual innocence claims are rare. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

To pass through the gateway to a merits review, a petitioner must provide new and reliable evidence that makes it more likely than not that no reasonable juror would have found him guilty at trial. *Schlup*, 513 U.S. at 329. The Court must first determine whether the petitioner has offered evidence that is both new and reliable. Then the Court must evaluate whether no reasonable and properly instructed juror *would* have convicted the petitioner considering *all* the evidence, new and old. Thus the Court makes a probabilistic determination about what a reasonable juror would do if she considered all of the evidence supporting and undermining a petitioner's guilt on a given count. If no reasonable juror would convict, then the petitioner passes through *Schlup's* gateway. The Court is not bound

by the evidentiary rules of admissibility and may consider evidence that was available, unavailable, or excluded at trial. *Id.* at 327–28.

## III. ANALYSIS

Petitioner and Respondents focus their arguments at different points along *Schlup's* actual innocence standard. Petitioner essentially assumes that the recantations constitute "new and reliable" evidence of his innocence on Counts 3 and 6, and therefore primarily focuses on whether a reasonable juror would have convicted him in light of that evidence. (Doc. 144, Pet. Br. 4–11.) Petitioner claims that the trial evidence on Counts 3 and 6 was thin, and consequently, the recantations undermine the already thin evidence such that no reasonable juror would have convicted him of those counts.

Respondents assert that the Court need not consider whether a reasonable juror would have convicted Petitioner of those counts because Petitioner has not provided "reliable" evidence of his innocence. (Doc. 146, Resp. Br. at 22.) Respondents base this argument on various circumstantial irregularities, which they claim undermine the creditability of the recantations. (Resp. Br. at 22–30.) For example, Respondents highlight that the written recantations were not made under oath, were made by Petitioner's family members, were created several years after Petitioner's trial, and, in some cases, appear to be written by Petitioner himself. (Resp. Br. at 22–30.) *See Jones v. Taylor*, 763 F.3d 1242, 1249 (9th Cir. 2014) (finding that the reliability of a recantation can be affected by its timing or the witness's relation to the accused). Nevertheless, Respondents assert in the alternative that even if the recantations are "new and reliable," a reasonable juror would still convict Petitioner on both counts. (Resp. Br. at 30.)

Notwithstanding the circumstantial peculiarities of the recantations that Respondents identify, the Court concludes that the recantations are "new and reliable" evidence of Petitioner's innocence on Counts 3 and 6. The written recantations of DP and LP, DP's telephonic interview, and LP's deposition are all new and contain sufficient indicia of reliability to constitute "new and reliable" evidence.[2] Nevertheless, the Court

---

[2] Though DP did not appear for a deposition, the Court still considers her telephonic

considers the irregularities noted by Respondent in its analysis of whether a reasonable juror would convict Petitioner.

Though Petitioner provides new and reliable evidence of his innocence, the Court still concludes that a reasonable and properly informed juror with all the evidence would find him guilty of Counts 3 and 6. The recantations implicate the credibility of DP and LP, but the juror would still likely conclude that the collective truth of all of their statements was that they were sexually assaulted by Petitioner consistent with the allegations of Counts 3 and 6. Furthermore, their victim testimony was not the sole evidence of those counts, so the evidence at trial was not as thin as Petitioner asserts.

### A. A reasonable juror considering all the available evidence would convict Petitioner of Count 3.

To evaluate Petitioner's actual innocence claim on Count 3, the Court must weigh all of the evidence and determine whether a reasonable juror would convict Petitioner. LP's four letters and her deposition testimony do not substantially undermine the evidence available at trial, so the Court cannot conclude that a reasonable juror would not convict Petitioner on Count 3. The Court reaches this conclusion for four reasons. First, LP's recantations do not necessarily contradict her trial testimony. Second, her recantations contradict established facts at trial and her memory is admittedly incomplete. Third, a reasonable juror considering all of the evidence would still believe LP's accusations rather than her recantations. Fourth, other witness testimony at trial proved Count 3.

#### 1. LP's testimony regarding her yeast infections does not necessarily undermine Petitioner's guilt of Count 3.

In her recantations, LP provided an alternate theory regarding her abnormal hymen—severe yeast infections that caused her to scratch herself until she bled. (Doc. 152.

---

interview because *Schlup* instructs the habeas court to consider all available evidence. *Schlup*, 513 U.S. at 327–28. Whether the interview constitutes "new and reliable" evidence under *Schlup* is a different issue than whether it would have been admissible at the vacated evidentiary hearing. (Doc. 139.) Nevertheless, in evaluating the weight of DP's interview, the Court will consider her failure to appear for a deposition, her explanation that her absence was due to financial inability, and the opportunity of counsel for the parties to examine her telephonically.

at 34–36.) These yeast infections occurred throughout LP's childhood before the alleged conduct underlying Count 3. (Doc. 152. at 34–36.) DP referenced the yeast infections during her interview with a police office before trial, although she claimed they only occurred when LP was a baby. (Doc. 60–2 at 5.)

However, LP testified that she did not know whether her yeast infections and scratching caused her abnormal hymen. (Doc. 152. at 35.) Thus the hypothetical reasonable juror would not hear definitive testimony that LP's abnormal hymen was caused by yeast infections. Instead, a juror would only be presented with conjecture that could raise an inkling of doubt about the cause of LP's abnormal hymen.

Furthermore, this competing cause does not square with the rest of the evidence. During a police interview, DP stated that the yeast infections only occurred while LP was a baby. (Doc. 60–2 at 5.) This aligns with DP's trial testimony that LP had a rash that did not require medical attention. (Doc. 15–3 at 130.) Although Petitioner's trial counsel elicited that LP could not remember all of her injuries, this fact does not provide definitive proof that Petitioner did not sexually assaulted her. After all, the jury heard this fact at trial and still convicted Petitioner. (Doc. 15–2 at 155.)

Even if LP had yeast infections, the available medical evidence does not prove that they caused her abnormal hymen. Dr. Coffman testified that the damage to LP's hymen was caused by trauma *i.e.*, penetration. (Doc. 15–3 at 16.) She testified that it was consistent with abuse and not associated with fondling. (Doc. 15–3 at 20.) She did not testify that it could be caused by scratching or a yeast infection. Thus, even if a reasonable juror was presented with evidence of LP's yeast infections and scratching, the medical evidence still indicates that her damaged hymen was caused by trauma.

Finally, LP's yeast infections are unsubstantiated. During her phone interview, DP stated that she did not have any medical records to substantiate the claims related to the yeast infections. (Doc. 148 at 15–16) And although LP recalls going to a clinic for yeast infections, she could not remember where she was treated. (Doc. 152 at 34.)

Ultimately, even if LP did have yeast infections and scratched herself aggressively, a juror could still find that fact consistent with Petitioner sexually assaulting LP. Indeed, the weight of the evidence indicates that a reasonable juror would find that LP's history of yeast infections does not undermine Petitioner's guilt.

> **2.  LP's independent memory of the events surrounding Count 3 undermines her recantations because it is incomplete and contradicts facts established at trial.**

LP unequivocally recanted her trial testimony stating that Petitioner did not touch her, and if he had, she would remember it. (Doc. 152 at 16.) Furthermore, she testified that she lied at trial because she was coached by the State and was told that it was the only way she would return to her family after being removed from her parents' custody. (Doc. 152 at 18–19) However, LP admits that she does not independently remember the events surrounding Count 3, remembers nothing about her childhood, and allowed the recantations to be drafted for her because of her lack of memory. (Doc. 152 at 40, 73.) Significantly, LP acknowledged that her memory was better at trial than it is now. (Doc. 152 at 74.)

LP's memory undermines her recantations more than it does her trial testimony. LP admits to having very little memory regarding the events surrounding Count 3. And her requests that DP or Petitioner draft her statements because of her lack of memory casts doubt that her recantations truly reflect her recollection. Indeed, it is unclear whether LP has any recollection. Thus, her spotty memory highlights the problems inherent with recantations. *See Jones*, 763 F.3d at 1249 ("As a general matter, [r]ecantation testimony is properly viewed with great suspicion.")

Additionally, LP's recantations contradict established facts at trial. During her deposition she testified that she was not returned home until months after trial. (Doc. 152 at 53.) However, at trial LP and DP testified that she had already been returned home by the time of trial. (Doc. 5–2 at 130, Doc. 5–3 at 98.) This fact does not necessarily prove that LP's testimony was not coerced because she could still have believed (or been told) she would be removed from her home again if she did not accuse Petitioner. Still, it undermines her recantation because her memory of this fact is untrue. Similarly, LP also

testified at trial that no one coerced or coached her testimony, although her recantations directly contradict that testimony. (Doc. 15–2 at 157.) And while she did not recall any abuse during her first interview with Wendy Dutton, which favors Petitioner, there was testimony at trial by Dutton regarding possible dissociation from abuse. (Doc. 15–2 at 169–170.)

Ultimately the evidence points in either direction. LP's recantation asserts that she was coerced into testifying, but her memory was admittedly better on the day of trial than it is now. Although LP has maintained her recantations for over ten years, she could not remember the details of her coercion without assistance from DP and Petitioner, and she did not assert them for serval years after trial. *See Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005). Thus a reasonable juror would likely conclude that Petitioner is guilty of Count 3 based on LP's memory.

### 3. LP's demeanor and exculpation of other family members inculpates Petitioner.

The trial court instructed the jurors that when deciding the credibility of a witness the jurors could consider: "the manner of the witness while testifying; whether the witness seemed to have an accurate memory; whether the witness had some interest in how the case should be decided; whether the witness appeared to have any motive, bias, or prejudice which might affect the reliability of what the witness said; [and] whether the witness made any inconsistent statements before the trial or during the trial." (Doc. 15–4 at 60.) Importantly, the jurors were not required to disregard a witness's testimony if it was contradicted by another witness's testimony or the witness's own testimony. Instead, the jurors were instructed to "consider each witness's testimony in light of all the other evidence in the case." (Doc. 15–4 at 60–61.) Finally, although the jurors were instructed to consider each count separately, they were also permitted to consider circumstantial evidence, and if they concluded that certain uncharged acts were proven, they could consider whether Petitioner has a character trait that gives him a propensity for committing unlawful sexual conduct.

At trial, LP was asked whether various family members had hurt her, whether they had put anything in her private, and whether she was afraid of them. With respect to each family member—her mother, father, brothers, and uncle—LP testified that she was not afraid of them, they had not touched her private, and they had not hurt her. (Doc. 15–2 at 144–46.)

When the prosecutor asked LP about Petitioner, her answers changed. She testified that she did not like Petitioner, she was afraid of him, and that she did not know if he touched her private or put anything inside of her. (Doc. 15–2 at 144–46.) She did not testify that Petitioner penetrated her, and she did not know why she was afraid of him. Instead, LP's only trial testimony directly proving sexual conduct by Petitioner was her testimony that he touched her private area when she was in the living room and that Petitioner pinched her chest. But the living room incident was not the subject of Count 3 and neither was the alleged pinching.

Still, the jury instructions reveal that a properly instructed juror need not weigh LP's trial testimony and her recantations in a vacuum. A reasonable, properly instructed juror could also consider the juxtaposition between LP's exculpation of her other family members with her failure to exculpate Petitioner. Though she did not outright testify that Petitioner penetrated her, she testified that he committed sexual misconduct against her. Additionally, in contrast to her definitive exculpation of her other family members, LP did not say that Petitioner did not penetrate her. This juxtaposition would allow a reasonable juror to conclude that LP's accusations against Petitioner were true, and that more serious conduct than she specifically testified to, in fact, occurred.[3] Indeed, her interview with Wendy Dutton that was played for the jury presented greater claims of abuse than LP testified to at trial.

---

[3] The Court notes that LP testified specifically that she was not testifying "I don't remember" because she did not want to talk about the subject matter of certain questions. (Doc. 15-2 at 140.) Still a juror would also have to consider LP's admitted nervousness, her fear that Petitioner would hurt her, and the relative ease with which she talked about other family members.

- 13 -

Furthermore, a juror would also be allowed to consider LP's alleged fear of Petitioner. Based on other circumstantial evidence presented at trial, including testimony regarding uncharged sexual misconduct by Petitioner, a juror could conclude that similar conduct formed a basis for LP's fear of Petitioner. Then a juror could conclude that LP might be afraid to confront Petitioner not only because she was testifying in court at nine years old, but also because he had sexually assaulted her.[4]

### 4. Other witnesses' testimony, the forensic interview video, and Petitioner's propensity to commit the charged sexual conduct prove Count 3.

KC and Cathy Underwood testified about an incident where LP went missing from her home after school. (Doc. 15–2 at 102–05, Doc. 15–3 at 83–84.) The family searched for LP in and nearby the house but could not find her. KC and Underwood differed on the length of time they searched for LP, but she was missing between half an hour and two and a half hours. During the search, KC knocked on Petitioner's bedroom door a few times. He did not answer for a couple of minutes and then asked, "What do you want?" (Doc. 15–2 at 102–05.) Petitioner did not open the door for several minutes, and when he did, he was in his underwear, according to Underwood but not KC. LP was laying in his bed on her back staring at the ceiling. This incident was essentially unrefuted at trial.

A reasonable juror would consider this testimony circumstantial evidence of Petitioner's guilt of Count 3. The evidence about this incident basically points in only one direction. Although DP claims that the incident did not occur because she claims Petitioner was working that day and his bedroom was always locked during the day, her refutation is incredible. (Doc. 60–1 at 3–4.) She lacks first-hand knowledge of the incident and her refutation is based on habit evidence about what Petitioner usually did. Moreover, her claims do not specifically refute the events since Petitioner's door could have been locked during the incident while he was in the room with LP. Ultimately, because Petitioner had

---

[4] The Court also notes that the substance of the testimony LP claims the State coached her to give—that Petitioner touched her private—does not match the charged conduct of Count 3. (Doc 1 at 17–18.) Therefore, the State needed more than LP's testimony to convict Petitioner on that count. The hypothetical diminution in the credibility of her testimony based on the recantations is not necessarily fatal to proving that count.

- 14 -

the opportunity to commit the acts underlying Count 3, the incident provides circumstantial evidence that he did commit those acts.

Other acts evidence also prove that Petitioner has a character that predisposed him to commit the acts underlying Count 3. Extensive evidence was produced at trial of Petitioner's uncharged sexual acts with DP, Carla Grant, Kathy Underwood, and Tracy Beauchamp during their adolescences. (Doc. 15–3 at 34, 43, 69–70, 79; Doc. 15–4 at 16–17.) The Court can consider what a properly instructed juror would conclude about this evidence and the recantations. At trial, a juror would consider this evidence and determine that Petitioner "had a character trait that predisposed him to commit the crimes charged." (Doc. 15–4 at 63–64.)

The Court concludes that a reasonable and properly instructed juror would conclude that Petitioner committed the uncharged sexual conduct and had a propensity for such conduct. A reasonable juror would further conclude that Petitioner's propensity would be circumstantial evidence of his guilt of Count 3. The recantations do not seriously undermine the testimony regarding the uncharged sexual conduct, nor do they counteract the likelihood that a reasonable juror would conclude that Petitioner has a character trait that gives him a propensity for committing the charged conduct. Instead the recantations focus on explaining the motivations behind the testimony of DP and LP, but they do not implicate the motivations of other witnesses testifying against Petitioner.

Finally, LP's trial testimony was not the only evidence the jury heard or saw in which LP accused Petitioner. Her second forensic interview with Wendy Dutton was also played for the jury. (Doc. 15–2 at 177.) During the interview, LP recounted that Petitioner touched her in places he was not supposed to, including her private parts. (Doc. 107, Ex. F; Doc. 112.) She stated that it hurt, that he did it more than once under her clothes, and that at he locked her in his room. (Doc. 107, Ex. F; Doc. 112.) She also stated that Petitioner touched her in DP's room. (Doc. 107, Ex. F; Doc. 112.) The jurors were also able to view LP scribbling furiously while describing Petitioner's conduct, and a reasonable juror would conclude that she was nervous during the interview. Although there are competing

explanations for why she could be nervous, the weight of the evidence points to her being afraid of Petitioner because of what he did to her.

Consequently, a reasonable and properly instructed juror considering all of the evidence, including the recantations, would conclude that Petitioner is guilty of Count 3. Accordingly, Petitioner cannot pass through the *Schlup* gateway and receive consideration of his IAC claim on that count.

**B. A reasonable juror considering all the evidence would convict Petitioner of Count 6.**

Though the evidence proving Count 6 was possibly more limited than the evidence proving Count 3, the weight of the evidence still supports the Court's conclusion that a reasonable juror would convict Petitioner of Count 6. There was no direct evidence of Count 3; there was no witness that testified they saw Petitioner sexually assault LP. Conversely, there was direct evidence of Count 6 because DP testified that she had sex with Petitioner during the relevant time period. (Doc. 15–3 at 122.) DP recanted this testimony but her history of recantation, the testimony of other witnesses, and established facts that contradict her recantations indicate that her accusations rather than her recantations are true.

**1. DP's previous recantation and her uncooperativeness with the investigation of Petitioner indicate that her accusations against Petitioner are true.**

DP testified at trial that she previously recanted accusations of sexual abuse by Petitioner in the 1970s. (15–3 at 120–21.) DP testified at trial that Petitioner first had sex with her when she was 13 years old and also sexually abused her in other ways. (Doc. 15–3 at 119.) Nevertheless, after she was removed from her home and talked to her mother and grandmother, she changed her statement to police and recanted the abuse allegations against Petitioner. She never accused Petitioner again because she was afraid. (Doc. 15–3 at 122.)

Undeniably, DP's testimony required the jury to sort through seemingly contradictory facts to evaluate her credibility. Her recantation via her letters and telephonic

1 interview complicate that task. The crux of her recantation is that she was threatened with prison and the loss of her child if she did not accuse Petitioner. Moreover, DP testified at trial that she was not cooperative in the investigation of Petitioner at the outset. Her explanation at trial for being uncooperative was that she was concerned that the accusations against Petitioner would not be taken seriously like when she was younger. Thus LP provides competing explanations for why she eventually cooperated with the investigation and prosecution of Petitioner. At trial it was that she saw that the investigation was being taken seriously and that Petitioner had gotten away with abuse for too long. Now it is that she was coerced.

Ultimately, it would be very difficult for a juror to perfectly square DP's motivations for changing her story at different times. DP now claims that there has never been sexual activity between her and Petitioner. This recantation contradicts her accusations in the 1970's against Petitioner and her reason for recanting then—fear and coercion. Furthermore, her present recantation implies that her initial lack of cooperation with investigators was because Petitioner, in fact, had done nothing wrong.

But in light of all of the other evidence, it is DP's present recantation that a reasonable juror considering all the evidence would conclude is false. Consistent with her trial testimony, a juror would conclude that DP recanted when she was younger because she was pressured and was afraid of being away from her family. A juror would also conclude that DP was initially uncooperative with the investigation of Petitioner because she was embarrassed about her sexual activity as an adult with Petitioner and she was afraid of the consequences of accusing him. (Doc. 15–3 at 125.)

Finally, in light of her testimony that Petitioner was intimidating and manipulative, DP's present recantations would be looked at with suspicion. (Doc. 15–3 at 108.) This is especially true in light of the fact that she did not recant for several years after Petitioner's trial, and first recanted only two weeks after visiting him in prison for the first time.[5]

---

[5] DP initially could not explain the delay during her telephonic interview, but eventually claimed that it was because she no longer lived with her children, and thus there was no longer a risk of losing them.

(Doc 148 at 29.) Additionally, a reasonable juror would conclude that Petitioner would be uniquely able to influence DP because there is evidence that his sexual abuse of her began when she was five years old and it continued through adulthood, and she continues to write him letters every day.[6] A reasonable juror would also need to weigh DP's credibility in light of her unwillingness to appear for a deposition. During her phone interview, she stated that she understood she could be charged with perjury because of her recantations, so it is noteworthy that she, in fact, has not recanted under oath or subjected herself to cross–examination.[7]

### 2. Other witnesses provided circumstantial evidence proving Count 6.

DP was not the only testifying witness at trial regarding sexual activity between Petitioner and DP. Carla Grant, Kathy Underwood, and Tracy Beauchamp all testified about Petitioner's sexual abuse of DP. A reasonable juror could properly consider this evidence in determining whether Petitioner had a character trait that, in turn, would make it more likely that he committed the conduct underlying Count 6. The widespread evidence of uncharged conduct with DP and others makes it probable that a juror would find that Petitioner had a character trait that made it more likely he committed Count 6.

The character evidence introduced against Petitioner, some of which included evidence provided by DP herself, undermines her current recantations. Essentially, a reasonable juror would conclude that DP's present recantation contradicts Petitioner's substantial history and character for the type of sexual conduct that DP is now claiming has never happened. But because the accusatory evidence also comes from several other witnesses, a reasonable juror would conclude that DP's recantations are false and her accusations are true.

---

[6] A reasonable juror would also have to reconcile how much influence, if any, Petitioner had in the drafting the recantation letters. Especially since some of the letters are drafted in noticeably different handwriting despite DP claiming to have drafted all of them without Petitioner's input and LP claiming that Petitioner drafted some of them. Doc. 148 at 6; Doc. 152 at 27.)

[7] The Court notes that DP claimed she was financially unable to appear to testify. (Doc. 148 at 48.)

- 18 -

### 3. DP's recantations contradict other established facts and are unsubstantiated.

It was established at trial that LP had already been returned home by the time of trial. (Doc. 5–2 at 130, Doc. 5–3 at 98.) Therefore, DP's claim that she faced the loss of LP if she did not accuse Petitioner is undermined by the fact that she already had been returned LP. Though it is possible that DP could have been told that LP would be removed from her custody again if DP did not testify against Petitioner, this is not what DP claims happened. Instead, DP claims that LP was not returned home right after DP testified and the charges against her were dropped. (Doc. 148 at 14.) However, the charges against DP had not been dropped as of trial, yet LP was already home, so this aspect of DP's recantation is plainly contradicted. (Doc. 15–3 at 126.)

Moreover, DP testified that she had not been offered any benefits in exchange for her testimony. (Doc. 15–3 at 126.) She also testified that she reached out to the State to discuss the criminal case against her before Petitioner's trial but the prosecutor refused to discuss her case with her. (Doc. 15–3 at 126.) She acknowledged that the prosecutor she now accuses of coercing her testimony had never met with her outside the presence of DP's attorney. Of course, DP's recantations contradict this and essentially assert that this testimony was a lie. Nevertheless, a reasonable juror would conclude, based on a consideration of all the evidence, that the State did not coerce DP's testimony. Moreover, DP testified at trial that she met with a detective at her own request and inculpated herself and Petitioner before she was ever arrested or charged with a crime. Therefore, the evidence indicates that she incriminated Petitioner before being charged with a crime, rather than in response to being charged with a crime. (Doc. 15–3 at 139.)

Finally, there is no independent evidence that the State coerced DP's testimony. And despite DP's claim that she was threatened with serving 25 years in prison unless she testified against Petitioner, there is no evidence that she was ever charged with a crime for which the penalty could have been 25 years in prison.[8] Furthermore, there is no independent

---

[8] DP claims that the prosecutor threatened her with three charges to make sure she

proof of DP's claim that she wrote Petitioner one month after his trial explaining why she testified falsely against him. (Doc. 148 at 23–25.) Consequently, her recantations lack proof, do not align with the rest of the evidence, and are undermined by the evidence.

Accordingly, the Court concludes that a reasonable juror considering all of the evidence for and against Petitioner's guilt of Count 6, would find him guilty beyond a reasonable doubt.

Therefore, Petitioner has not presented "innocence so strong that [the] Court cannot have confidence in the outcome of the trial." *See Schlup*, 513 U.S. at 316. Finally, the Court concludes that it is unnecessary to reach Petitioner's defaulted and barred claims to prevent a fundamental miscarriage of justice.

**IT IS THEREFORE ORDERED** that the remaining portion of Ground 1 of the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus (Doc. 1)—the claim for ineffective assistance of counsel related to Count 6 of the indictment—is **DISMISSED**.

**IT IS FURTHER ORDERED** that the remaining portion of Ground 2 of the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus (Doc. 1)—the claim for ineffective assistance of counsel related to Count 3 of the indictment—is **DISMISSED**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to close this case.

Dated this 27th day of March, 2020.

*[signature]*
Honorable John J. Tuchi
United States District Judge

---

got a minimum sentence of 25 years. (Doc. 48 at 42.) However, at the time of Petitioner's trial DP was only being prosecuted for obstruction of justice. (Doc. 15–3 at 126.)